Victor Harry FEGUER, Appellant,

v.

UNITED STATES of America,
Appellee.

No. 16739.

United States Court of Appeals
Eighth Circuit.

April 16, 1962.

See also 192 F.Supp. 377.

216

Paul L. Kildee and Frederick G. White, Waterloo, Iowa, made argument for appellant and were on the brief.

F. E. Van Alstine, Sp. Asst. U. S. Atty., Des Moines, Iowa, made argument for appellee, and Donald E. O'Brien, U. S. Atty., was with him on the brief.

Before VOGEL, VAN OOSTERHOUT and BLACKMUN, Circuit Judges.

BLACKMUN, Circuit Judge.

This is an appeal in forma pauperis from a judgment and sentence of death.

Victor Harry Feguer on August 9, 1960, by indictment returned in the Northern District of Iowa, was charged with a violation of the Kidnapping Act, 18 U.S.C. § 1201(a), in that on or about July 11, 1960, he knowingly transported Edward Roy Bartels in interstate commerce from Iowa to Illinois, after the latter was unlawfully kidnapped and held, and in that the victim was not liberated unharmed. Feguer pleaded not guilty. The defense of insanity was noticed. The jury trial from March 1 to 12, 1961, resulted in a verdict of guilty and, as authorized by § 1201(a), in the jury's recommendation that the defendant be punished by death. Accordingly, and pursuant to 18 U.S.C. § 3566 and to § 792.9 of the Code of Iowa, 1958, I.C.A., a sentence of death by hanging was imposed. This appeal followed.

Edward Roy Bartels, 35 years of age, was a physician engaged in general practice in Dubuque, Iowa. He left his home on Monday evening, July 11, 1960, in response to a telephone request for medical assistance. He did not return. His body was found on the early morning of July 21 in a wooded rural area some 5 miles across the Mississippi River in Illinois. He had been killed by a bullet which entered the back of his head.

After what appears from the record to have been an exhaustively and well tried case, with meticulous attention given it by counsel for both sides and by the trial judge, nine issues emerge on appeal. They are, in substance, that the district court committed reversible error

1. In finding that the defendant was mentally competent to stand trial;

2. In refusing to issue subpoenas for two psychiatrists as defense witnesses at government expense;

3. In asking questions on the insanity issue, embracing the concept of right and wrong plus irresistible impulse, of a court appointed psychiatrist witness, and in permitting similar inquiry, through hypothetical questions, of a psychiatrist called by the government in rebuttal;

4. In refusing instructions requested by the defense on the insanity issue in line with the Durham rule and the American Law Institute suggestions;

5. In denying defense motions for the suppression and return of evidence seized in Alabama;

6. In denying a defense motion for the suppression of evidence seized in Dubuque;

7. In denying a defense motion to suppress certain statements of the defendant;

8. In foreclosing certain comments on capital punishment in the closing argument for the defense; and

9. In not foreclosing certain comments in the closing arguments for the prosecution.

All these issues, with an exception as to point 9, were preserved by appropriate objection during the trial. In addition, the defense moved for judgment of acquittal, under Rule 29, F.R.Cr.P., 18 U. S.C.A., at the conclusion of the government's case and again at the close of all the evidence. These motions were denied.

It is perhaps unnecessary to say that when a criminal case involving the ultimate penalty which the law can impose comes before an appellate court for review, that court has an obligation, serious and profound, to examine with care every point of substance raised by the defense and to acquaint itself intimately with the details of the record. This is especially so where, as here, the case concerns both an emotionally offensive act and many facets of the criminal law which today are particularly sensitive. We have had this obligation in mind as we worked on this record and the briefs.

We note initially that there is little dispute as to many of the facts or as to the sufficiency of the evidence (including that on the insanity issue), if it was properly admitted, to sustain the jury's verdict of guilty. Specifically, there is now no real dispute that this defendant was the kidnapper of Dr. Bartels and is the person who shot and killed the doctor in Jo Daviess County, Illinois, on the night of July 11, 1960.[1] The real controversy centers around the admissibility of much of the evidence. The nine issues thus narrow and coalesce themselves into general questions having to do with (1) the defendant's competency to stand trial, (2) his defense of insanity or, as is sometimes said, his responsibility for his act, and (3) the fairness of the trial itself.

We turn to the facts which, perhaps, we cover in too much detail. We do this so that the entire story, with all of its implications, may be apparent.

*The defendant's background.* Feguer was born in Michigan in 1935 and was 25 years of age at the time of the crime. His mother died after a short illness in 1941 when he was about 6. Although his father was living, he went to stay with his paternal grandparents. They apparently were good to the defendant but they permitted him to do about as he pleased. As he grew older the defendant ran around and at times would stay away from home. His father was addicted to drink; after the death of the defendant's mother he joined the Navy for two years. When the defendant was 11, his uncle (his mother's brother) felt the grandparents' home was not very good for him and asked the boy to live with him. He did so for three weeks. About this time he took money from the grandfather

---

[1]. In the closing argument for the defense it was said,

"Now, ladies and gentlemen, after thirty years in and out of courtrooms, I wouldn't be naive enough to deny that the Government hasn't, with overwhelming evidence, proven that this defendant was involved in this kidnapping as charged. * * *

"The fact that we let witness after witness after witness leave the witness chair without cross-examination is no indication that we didn't have interest in the case, but what was the use of our trying to dispute undisputed facts and waste the time of this Court and the time of this jury. Likewise, how could we cross up the story of an expert witness, a fingerprint man, and the others. There just isn't any use in trying."

and bought a motor scooter. His father was living with a woman elsewhere and the defendant went to stay with them. He was there a few weeks and returned to the grandparents for a short time. He was placed in a juvenile home where he stayed two months. The proprietor suggested that the uncle and his wife provide a home for him but they felt they could not do so because of the size of their own family. He stayed with an aunt who was working in Lansing. He did not attend school and was placed in a home for boys. He apparently came down with tuberculosis and was hospitalized for nine months.

Up to this time, age 16, he had experienced little formal difficulty with the law but he had been involved in minor thefts. However, in May 1951, shortly after his release from the boys' home, he was convicted of burglary and car theft and sentenced to the Michigan State Prison at Jackson. He was there until paroled in August 1955. He went to live with another uncle. The first uncle, during this period, provided him with $50 spending money a week to enable him to buy clothes and get around to seek work; this was paid through the probation officer. The amount, at the suggestion of the officer, was lowered to $40 a week. On one occasion during this period additional money was given the defendant because he said his father had taken funds from him. In late 1955 he was again convicted of car theft and was returned to the state prison. He was finally discharged there on April 14, 1960.

*The defendant's activities through the afternoon of July 11, 1960.* On May 3, 1960, the defendant obtained work as a stock clerk in a Kroger store at Galion, Ohio. He quit or was discharged after five days. Later in May he worked for about two weeks as a kitchen helper in a restaurant in Broadview, Illinois, west of Chicago. He had been referred by an employment agency. He came to Chicago on a truck from Ohio and said that his luggage was stolen when he was let out in a rough neighborhood in the middle of the night. On May 27 the defendant registered with the Milwaukee district office of the Wisconsin State Employment Service. His application contained references to his work at Galion and Broadview but many of his statements as to education and duration of employment were not accurate.

On May 28 he obtained employment with a janitorial service in Milwaukee and was there until June 18. He was eventually discharged because "it was a case of a lot of standing around, talking, and not applying himself" and "there were a lot of areas that were never touched". On June 1, while still working for the janitorial service, he answered an ad for a manager of a Milwaukee rooming house just acquired by a new owner. He was employed. During the last part of June he collected rents, gave receipts and kept stub records. When under supervision he did his work adequately though grudgingly and when not under supervision his work was described as sub-standard. He lived on the premises. He drank on the job. The owner's son did not regard him as highly reliable and would not have given him a job in his accounting firm, but he felt that the defendant was not a danger for the family's interest in the kind of work he was doing. He left without notice about July 8, taking $55 in rent money with him. He was not bonded. He had been given a bond application to fill out about July 6 but left without completing it. Some apartment keys were missing when he left.

During this time the defendant opened a checking account at the First Wisconsin National Bank, Milwaukee, and obtained personalized checks bearing his name "Victor H. Feguer". On July 2 he drew one of these checks in favor of Becker's Sporting Goods Store, Waukesha, Wisconsin, in the amount of $37.20. This check was paid. It was used to purchase a Browning designed .380 automatic Czechoslovakian-made hand gun and cartridges for it.

On Thursday, July 7, in the early evening, the defendant arrived by bus in Dubuque, Iowa. He hired a cab to go

from the bus station to a rooming house at 1004 Bluff Street. That evening the wife of the owner of the rooming house had received a telephone call in response to her newspaper ad about a vacant room. She drove to the house and found the defendant waiting for her on the front steps. He rented the room. He told her he was an artist and accountant on vacation for a month and that he wanted to work in the room and to do some painting. He said his name was Sam Newman. She issued a $6 receipt to him in that name for a week's rent paid in cash.

On July 8 the defendant called at a used car lot in Dubuque. He looked at an automobile there and rode in it with the salesman. He identified himself as Sam Newman and said he was from Milwaukee and was in Dubuque because he had had trouble with his wife. They arrived at a price of $1,000 for the car. The defendant offered a personalized check in payment but the salesman refused to accept it until it had cleared. The salesman noted the name Feguer on the check but the defendant explained that he was a commercial artist and that the name Newman looked better in print than the other name. The defendant then indicated he had changed his mind about buying the car but said that he would be back the next morning.

On Saturday, July 9, the defendant stopped at a finance company in downtown Dubuque to discuss an automobile loan. This was refused because he was not employed and he had just come from out of town. He was told, however, to come back if he could get a Dubuque jobholder as co-signer. He took some shirts and trousers to the Dubuque Laundry Service. He gave the name of Newman there and asked that the work be done quickly. About this time [2] he cased most of the loan offices in Dubuque with the idea of committing a burglary.

On the evening of July 9 William Lloyd Howes of Dubuque took his girl to a nine o'clock show. They drove downtown in his automobile and parked it at the curb. Howes threw the keys in the glove compartment. The compartment also contained a packet with his draft card, driver's license, social security card, and an insurance card, all bearing Howes' name. When Howes and his companion returned the car was gone. It was recovered the next morning but the keys and card packet were missing. The car had traveled about 35 miles and was muddy. The defendant after his arrest stated [3] to federal agents that on the evening of July 9 he and a companion, Alex Dupree, were standing on a corner when the Howes car drove up; that a man and a woman got out of the car; that Alex noted the man had thrown something into the glove compartment; that they entered the car and found the keys and identification material; and that they drove the car around for an hour and then abandoned it.

On Saturday morning, July 10, the defendant purchased milk and other food at a grocery store. On the 11th he cashed a check at a Dubuque bank. This was for $6 and was drawn on his Milwaukee account. It was paid and was the last check honored on that account. Its payment reduced the defendant's balance to $2.59. He returned later on the same day with a $65 check. The girl teller refused to cash it without an officer's approval. The defendant consulted an officer who asked him if he knew anyone in the city. He said he knew a parish priest. The officer said that if the priest would indorse the check it would be cashed.

The defendant stopped in at the Modern Music Store. He spent an hour looking at radios and finally chose one. He offered a check in payment. This at first was refused. At the defendant's suggestion the Milwaukee bank was called and the account number was verified. His check for $95.82 to cover the radio, batteries and the call was then accepted

---

2. As later related to federal agents. See point 7.

3. The admissibility of this is challenged. See point 7.

The defendant went to the De Maio Brothers Shoe Store. The proprietor waited on him. He selected a pair of shoes and offered a check in payment. He said he was from Milwaukee, was vacationing in Dubuque, and was staying at 1004 Bluff Street. The proprietor's niece took over the transaction at this point. They kidded back and forth about people trying to pass bad checks. The check was accepted. The niece said she approved it because the defendant had given a Dubuque address and an assurance that he would be in town for a while. The defendant went to Enzler's Luggage Shop. His check in payment for luggage was refused. He returned to the Dubuque Laundry but his things were not ready. He went to the Penney Store and bought a suit and a pair of trousers and paid for them with another check for $39.74.

*The evening of July 11.* About 7:00 p. m. a telephone call was received at the Bartels home in Dubuque. Mrs. Bartels answered. The caller asked for Dr. Bartels and identified himself as a Mr. Stevens. She summoned her husband. The caller stated that he and his wife were visiting in Dubuque; that his wife had had surgery; that she was suffering post-operative pain for which she had been taking medication; and that she was at an address on Locust Street at which there was no telephone. Dr. Bartels agreed to come and left his home about 7:30 p. m. He wrote the address "1134 Locust Ed Stevens" by the telephone so his wife would know where to reach him if necessary. He carried a billfold with currency, his identification cards, and his drivers license. He drove off in his 1959 two-door blue-grey Nash Rambler automobile.

The following account was given by the defendant to federal agents after his arrest:[4] On the evening of July 11, he wanted to get in touch with a general practitioner because that kind of physician would be more likely to have morphine or demerol needed by the defendant's companion. This companion was Alex Dupree and he was with him at a room he had rented at 1004 Bluff Street. He, the defendant, went to a nearby drug store and looked at the yellow pages of the telephone book. The first name listed was that of a surgeon. The second name was that of Dr. Bartels. He called the doctor's residence. A woman answered and summoned the doctor. He told the doctor his wife had been under home treatment with demerol. He gave the doctor a Locust Street address. The doctor arrived there driving a Rambler. The defendant met him and told the doctor they had been visiting friends at that address but because of his wife's illness she had returned to their residence. He got in the car with the doctor and directed him to 1004 Bluff Street. They went up to the rear bedroom on the second floor. Alex was in bed. He, the defendant, pulled a gun on the doctor there and told him that they did not intend to kill him. The three left the house with the defendant holding the gun under a paper. They entered the car. He told the doctor to drive through the business district of Dubuque. The doctor blinked his lights on the way. The defendant told him to keep them on low beam and if he tried any funny business he would kill him. He directed the doctor to Highway 20 and east across the bridge to East Dubuque, Illinois, and on into the countryside. He told the doctor to drive down a side lane. This, however, ended in a farmstead. They returned to the highway and continued east. They turned off to the left. A mile and a half down this road he told the doctor to stop. He and the doctor got out of the car. The doctor was very nervous during the trip and many times asked if he was going to be killed. He tried to assure the doctor that he was not. When they stopped he told the doctor to take some pills for his nervousness and he obeyed. The area there was not suitable for leaving the doctor so they went down the road another mile or so where there was a line of trees over

4. The admissibility of this statement is challenged. See point 7.

a slight rise. Here the three got out of the car, crossed a fence, and walked through a corn field to the wooded area. He told the doctor they were going to tie him up and that later he would call the doctor's wife and later still the state police and let them know where he was. The defendant then knew he was already involved in a kidnapping and didn't want a murder on his hands. At this time Alex had the gun. Alex shot the doctor behind the ear and he fell. Alex took the billfold from the doctor and pulled the body farther into the brush. He and Alex returned to the car and he took the gun from Alex. He drove the car back to Dubuque. On the way they stopped at a tavern. They went to the rooming house and got their bags. He then stopped at a telephone, called the doctor's residence, and told the woman who answered that the doctor would be detained over night. The defendant also went on to tell of his shooting Alex, putting his body into the car's trunk, throwing him into the river at East Dubuque, disposing of bloody blankets and his own bloody shirt, and driving on to Chicago.

A witness identified the defendant as the person who used the public pay telephone at Holscher's Pharmacy at 11th and Main, one block north and one block east of 1004 Bluff Street, in Dubuque, around 7:00 p. m. on July 11, and who spoke in that conversation of his sick wife. The defendant's right thumb print was found in the telephone directory, chained at this telephone, upon the page opposite the one which contained the list of Dubuque physicians. Dr. Bartels' name and telephone numbers were second on that list. A witness who lived at 1022 Bluff Street, which is part of a triplex with 1004 Bluff, saw the defendant and a person he identified as Dr. Bartels enter 1004 Bluff about 7:20 p. m. and emerge about 8:00 p. m. The man with the defendant was carrying a bag and a stethoscope. They then drove by in a small blue-grey car, with the doctor driving. A parttime employee at a hospital which the

doctor used saw him shortly before 8:00 p. m. The employee was parking her car on Bluff Street and saw the doctor coming up the street with another man. The employee got out of her car and greeted the doctor. The doctor responded with a loud "hello" and with an appearance which the witness described as "a look of fear". The employee identified the defendant as the man accompanying the doctor.

At about 10:00 p. m. another call came to the Bartels' home. It was the same man who had made the first call. He told Mrs. Bartels that the doctor had asked him to call to tell her that the patient was very ill, that he would be detained several hours and possibly over night, and that a specialist was being called.

When the doctor's body was later discovered, two rows of footprints, not three, were still visible across the corn field and approaching the wooded area where the body lay, and only one pair, not two, went in the opposite direction and approached the road.

*The events after July 11 and prior to the arrest.* At 8:00 a. m. on July 12 the defendant registered at the Roosevelt Hotel in Gary, Indiana, under the name of J. C. Austin of Evanston, Illinois.

On the evening of July 12 the Dubuque police searched the room the defendant had occupied at 1004 Bluff Street. They found a Quality Cleaners slip, dated July 8, in the name of Newman, for a pair of pants; a printed addressed envelope for the First Wisconsin National Bank, Milwaukee; a Wisconsin State Employment Service card issued to Victor H. Feguer; the identification portion of a Central Greyhound Lines bus ticket; one die with a horseshoe insignia; a Dubuque Laundry slip in the name of Newman; the room's rental receipt issued to Sam Newman; and fragments which Howes recognized as the identification in his key case.[5]

In the forenoon of July 13 the defendant appeared with a 1959 Nash at a used

5. The search of this room was made without a warrant. The objects found there are the subject of a defense motion to suppress. See point 6.

car lot in Gary. He introduced himself as Dr. Edward Bartels from Dubuque and produced the 1959 registration for the automobile. He stated he wanted to "trade down", that is, turn the car in for an older less expensive car plus cash. He could not, however, locate the title and in the presence of the salesman he searched his wallet and envelopes in the car's glove compartment. The salesman suggested the defendant call his wife and if she would mail the title card he would make the exchange. The defendant was reluctant to do this and the deal was not closed. The salesman described the proposed transaction as "fabulous".

On the 16th the defendant cashed small checks in Dr. Bartels' name at three Gary filling stations. On two of these occasions he had a stethoscope around his neck. On all he used the doctor's identification material. On the same afternoon he bought clothing at the Penney Store with a check in the doctor's name. Later he attempted to purchase an $80 watch at the Busch Jewelry Company. He asked for a blank check. One was offered and he filled it out. The manager gave him a receipt but told him he could have the watch on Monday when the check had cleared. The defendant did not return. His dirty appearance, his not seeming to be a doctor, the manager's recognition that the Gary address he gave was nonexistent, his asking for a check late on a Saturday, and his story that he had just come to town and yet wanted a watch immediately made the manager suspicious.

Jack Howard Hale, a twice-convicted felon and then in the Atlanta penitentiary, testified as a court witness at the trial. He gave the following account: He met the defendant on the street in Gary during the day of July 15. He "bummed" the defendant for a drink. The defendant bought him a drink and gave him money. They went together to a beach on Lake Michigan where they swam and fired a few shots with a pistol the defendant had. They returned to town for more drinks. Hale had no place to stay and spent the night with the defendant in his hotel room. The defendant had a Nash with Iowa plates. He had no luggage but did have a physician's bag. On the 16th they went out to cash checks. An A & P store would not accept one. They went to a Penney store where the defendant bought some clothing with a check. They went to three oil stations where checks were cashed. The defendant used his stethoscope and Dr. Bartels' name in doing this. Hale warned him that his license number would be placed on the checks. The defendant said he did not care for the car was stolen anyway. They cleaned up and put on the new clothing. They picked up the doctor's bag at the hotel but left other clothing there and drove that night to Holland, Michigan. They arrived there early on the 17th and rented a tourist room. They went to the beach for an hour and returned to the room and slept. They went out that evening for something to eat and drink and stayed in the room that night. On the morning of the 18th they went to Grand Rapids. They had the stethoscope with them but left the bag at Holland. They tried unsuccessfully to get some blank checks in Grand Rapids. Hale bought a Grand Rapids newspaper for July 18 and saw on the front page a story with a Dubuque dateline about the disappearance of Dr. Bartels and stating that he had been seen in the company of Victor H. Feguer. Hale showed the paper to the defendant as they were getting gas. The defendant told Hale that his name was not Feguer but was Newman and that he had persuaded the doctor to come out on a call, had held a gun on him, had taken him out to a wooded area on the highway and had left him with his buddy while the defendant took the doctor's car. The defendant said that he did not know where the doctor was and that his buddy had him and was holding him for ransom. Hale told him that he did not want to get mixed up in anything like that and did not want to stay with the car. The defendant said that they were not going to take him alive and that Hale's fingerprints would be on the car and he would be implicated. The defend-

ant asked him to help steal some license plates. Hale at first refused and waited in a tavern. The defendant returned and said he needed someone to watch while he took a front plate off another Nash Rambler. Hale went out with him to a parking lot where the other car was. Hale got the front plate off and put it on their car. The defendant did the same with the rear plate. Dr. Bartels' identification was destroyed at a service station restroom. They returned to Holland and the defendant got the bag. They then headed for Birmingham, Alabama, leaving about 9:00 p. m., the evening of July 18. They drove straight through and reached Birmingham about 6:00 p. m. on July 19. On the way Hale, at the defendant's instructions broke up the Iowa plates and threw them away a piece at a time. The defendant had the gun on the seat beside him on this trip. He told Hale that if they were stopped he would try to outtalk the police and, if necessary, shoot it out with them and that Hale was to tell the police the defendant's name was Howie. On the way the defendant asked Hale if Alabama was a title state for automobiles. In Birmingham they checked in at the Ansley Hotel where Hale registered them as "Jack Jason and Bro." They bought beer, took baths, and went to bed. The next morning, the 20th, they went to several used car lots in an attempt to sell the automobile and were arrested by the FBI.

The 1959 Nash from which the Michigan plates were taken was owned by the City of Grand Rapids. The disappearance of the plates was noted by the city vehicle supervisor late on July 19. He reported it to the police. The plates in question were 1959 plates No. X–23831 with a 1960 tag and an additional city tag. The "X" insignia was used for plates issued to Michigan municipalities.

On July 22, shortly after midnight, the Austin room at the Roosevelt Hotel in Gary was examined by a federal agent accompanied by the hotel manager. Clothing, the defendant's suitcase, the mate to the horseshoe die, and the pair of old shoes the defendant had worn into the De Maio shoe store in Dubuque were found there.

*The arrest and events immediately thereafter.* On July 20, 1960, a complaint was filed in the Northern District of Iowa charging the defendant, in violation of 18 U.S.C. § 1073, with interstate flight to avoid prosecution for kidnapping and a warrant for the defendant's arrest was issued. Information as to this warrant, however, was not received by federal agents in Birmingham until about 5:00 p. m. on July 20. That day and its successors produced the following events chronologically:

At about 10:30 a. m. the Birmingham FBI office received a telephone call from J. B. Alford, manager of a used car lot in that city. Alford stated that a man had just been in his lot attempting to sell at a below-normal price a 1959 Nash Rambler with Michigan plates; that he had seen in a local newspaper a photograph of a person named Smith Gerald Hudson who at that time was a federal fugitive; and that it was possible the man driving this automobile was Hudson. He further stated that the man did not have a title for the car so the purchase was not made. The FBI then called other used car dealers in the area and told them of this attempt to sell the Nash. Four other dealers said that such a car had also appeared at their lots.

Hudson had been convicted of murder and other crimes and was charged with interstate flight to avoid confinement after the murder conviction. A warrant for his arrest had been issued on August 26, 1957, by the United States District Court for the Middle District of Pennsylvania and was still outstanding. He was on the list of the ten men most wanted by the federal authorities. A current FBI circular carrying Hudson's photograph and fingerprints and other descriptive material contained a precautionary notice that he should be considered armed and dangerous.

After Alford's call instructions as to Hudson and his possible presence in Birmingham were broadcast by the FBI to

their men in the area. A special agent went to see Alford. He carried a photograph of Hudson without glasses. Alford stated that if glasses had not been worn by the driver of the Nash he would look very much like Hudson. Two others at the lot said the same thing. The man had told one of these salesmen that he wanted to trade down the car but that he didn't carry the title papers because if the car were stolen the thief would thereby have the papers and could sell it. On the basis of all this Alford had called the FBI office. The same agent called at some of the other places where the Nash had been seen. He talked to about fifteen people. Eight of these had seen the men in the Nash well enough to comment about their similarity to Hudson when the latter's picture was displayed. Three of these identified the driver as Hudson; three others thought the passenger in the Nash looked like Hudson.

Shortly before 1:00 p. m. the Nash was reported to be in a neighboring area. By radio control FBI cars closed in and first observed the Nash parked in front of an automobile parts and junk yard. Only one man was in the car; he was in the right front seat. The defendant came out of the yard, entered the Nash, and drove it out from the parking place. As the Nash pulled into the parking area of another junk yard four FBI cars with seven agents converged on it and blocked it, and agents, with guns drawn, stated that they were from the FBI and ordered the two occupants to come out of the Nash and to be braced against it. This was at approximately 1:30 p. m. The defendant was frisked. This led to the discovery of several .38 caliber cartridges in his left pocket. He was asked where the gun was and he replied, "On the seat". An agent saw and picked up the gun from the front seat of the car. It was loaded. The defendant was then handcuffed. He said his name was Howes. The agents had with them Hudson's identification card and fingerprints. They looked at the fingers of the two men and concluded that neither was Hudson. The handcuffs

were then removed. The agent then in charge advised the defendant that he did not have to talk, that he had the right to consult a lawyer, and that any statement he made could be used against him. One of the agents noticed a physician's bag on the back seat of the car and asked the defendant what he was doing with it. He said a doctor had given it to him on a gambling debt and that the doctor was an alcoholic and an addict. Another agent, who had been stationed in Michigan during military service, had observed the license plates and noticed the "X" preceding the numerals. He knew, from his Michigan experience, that a Michigan plate of that year with that kind of symbol was one issued to a municipality. He gave this information to the other agents. The Grand Rapids city tag on the car had also been noted. The defendant was asked if he was an employee of the City of Grand Rapids. He replied that he was not.

The head agent asked the defendant if he would come to the FBI office. The defendant said he would and that "You can check all you want to and you will find that this car is legitimate, it's perfectly registered to me, and it is my car". Hale also agreed to go. This was apparently a voluntary action on the part of both of them but the agent then in charge later stated that had the defendant refused to come they would have taken him in anyway. With the defendant's stated permission, an agent drove the Nash back to the office, parked it in the street and, on instructions, brought the doctor's bag up to the office where it was examined and tagged.

At the office, about 2:00 p. m., the defendant was interviewed, fingerprinted, photographed and checked against identifications of other men wanted by the FBI. He continued to identify himself as Howes. He produced Howes' driver's license and cards. The agent then in charge instructed another to go down to the street to examine the Nash. The serial, motor, and license numbers and tags were noted and this information was passed on to the Detroit office. The

car was not otherwise then subjected to a search. Detroit returned the call about 3:15 p. m. and stated that they did not have a stolen car report on the automobile but that the plates had been reported stolen from a 1959 Nash belonging to the Grand Rapids health department. The defendant was confronted with this information. He then promptly admitted that his name was Feguer and, a little later, that the car and the license plates were stolen. The agents took a formal statement from him to this effect and he signed it.

About 3:15 p. m., after the defendant had admitted the car to be stolen, two agents again went to it and brought back various things found in it. These included a transmitter and 2 Missals which were in the glove compartment, and a pillow case containing a stethoscope, a receipt from the Busch Jewelry Company of Gary, a box of .38 cartridges, road maps and other items. All these were taken without a search warrant.

The information as to the defendant's name and the fact the car was stolen was relayed to Detroit. This time Detroit advised Birmingham that they understood a man by the name of Feguer was wanted in Iowa for kidnapping and suggested that Birmingham call the Omaha office for details.

The agent then in charge told the interviewers that he had some information about a major crime but did not have the details on it and that the interview should be held up until those details were in. The interview with the defendant was then suspended at approximately 4:00 p. m. An agent sat with the defendant until 6:00 p. m. but during that period no questions were asked of him. No threats, promises or inducements had been made.

About 5:00 p. m. contact was made with the agent in charge of the Omaha office. He was in Iowa at the time. He told Birmingham of the issuance of the Iowa federal warrant. At 6:10 p. m. the agents advised the defendant that he was under formal arrest on the fugitive charge.

The sole United States Commissioner in Birmingham at this time had an office in the Federal Building and was there daily from 11 to 3. She resided some miles out of town but had no telephone at the time. When the Birmingham office received the information about the Iowa warrant the agent in charge immediately tried to get in touch with the Commissioner and with the two United States district judges in Birmingham at their offices in an attempt to arrange for a preliminary examination under Rule 5, F.R.Cr.P. This was unsuccessful. It was ascertained later that the Commissioner was on vacation. No attempt was made to reach either judge at his home.

A further and long interview with the defendant began about 6:10 p. m. This was conducted by the Special Agent in Charge and by two others. The defendant was again advised that he was not required to make a statement, that any statement could be used against him in court, and that he had a right to consult an attorney. The interview continued until 9:30 p. m. when it was recessed for 50 minutes. It was resumed at 10:20 and the defendant started making admissions. He dictated a statement from 10:42 until 11:19. This was then typed and completed at 12:57 a. m. At 1:05 a. m., after the defendant had read the statement, he wrote a final paragraph in longhand. The interview room was equipped with normal lights. The defendant was seated during the interview and was not restrained. No threats, promises or inducements were offered and no voices were raised. The defendant left the office at 1:21 a. m. to go with two agents to the county jail. No questions were asked of him at the jail. He slept for three hours.

On the morning of July 21 the Assistant United States Attorney for the Northern District of Alabama was asked to arrange with one of the federal judges in the city for the preliminary examination. The Honorable H. H. Grooms was the first judge who became available that morning. A hearing was held in

his courtroom about 10:45 a. m. The defendant was present. The court was advised that the defendant was being held on a federal warrant out of Iowa charging unlawful flight to avoid prosecution but that the warrant had not yet been received. The court found Mr. Hugo L. Black, Jr., a competent lawyer and one experienced in federal court matters, in the building at the time. He was appointed to represent the defendant. Mr. Black conferred with the defendant. The court made inquiry about the warrant, set bond at $25,000, and continued the matter until the late afternoon of the 22nd.

That afternoon two agents interviewed the defendant at the jail. They took clothes to him and he released the clothes he had on to them. Among these were the shoes he had bought at the DeMaio store on July 11. The defendant signed and delivered a statement that he voluntarily released this personal clothing to the agents. This visit was made without the knowledge of the court or of the defendant's Birmingham court-appointed counsel. On July 22 two agents again interviewed the defendant for an hour at the jail. This interview also was without the knowledge of the defendant's Birmingham counsel or of the court.

By the time of the court hearing scheduled for July 22 the papers from Iowa had still not arrived. The matter was continued to Monday morning, July 25.

At 10:20 a. m. on July 23 Special Agents Dawson (from Waterloo, Iowa) and Brown, neither of whom had been present at the interview on the night of July 20, interviewed the defendant for about three hours at the Birmingham jail. Dawson had not seen the defendant prior to this interview but he was aware that the defendant had given a statement the night of July 20. The agents did not have a copy of that statement and it was not mentioned or referred to during the interview. The agents who had conducted the interview of July 20 were not present on July 23. The defendant again was initially advised that he did not have to make a statement, that any statement he made could be used against him, and that he had a right to counsel. At this interview the defendant told his detailed story of the events of July 11 set out above. Here again the agents effected this interview without knowledge of court and counsel.

By July 25 the awaited papers, including a federal complaint on the kidnapping charge under § 1201(a), had been received. Mr. Black in the meantime had advised the court that he would be out of town on the 25th. His older partner, William Mitch, also a lawyer with federal court experience, was appointed by the court and represented the defendant at the hearing on the 25th. The kidnapping complaint was read to the defendant. He waived hearing and signed his consent to removal; a warrant of removal was issued. Later, after the hearing, agent Dawson and two others called on the defendant at the jail. They questioned him about Dupree and the claimed disposition of his body at East Dubuque. This interview was without the knowledge of Birmingham counsel and court.

*Steps pertinent to the issue of competency to stand trial.* On July 25, the same day the last hearing was held in Birmingham, the United States Attorney for the Northern District of Iowa, because of information supplied by Michigan officials and in connection with the warrant of arrest on the kidnapping charge, filed with the Iowa federal court a motion, pursuant to 18 U.S.C. § 4244, for judicial determination of the defendant's mental competency and for commitment of the defendant to a United States medical center for examination. This motion was granted forthwith and the defendant was committed to the center at Springfield, Missouri. He went there direct from Birmingham. He was at Springfield for observation and psychiatric evaluation from July 26 to August 19, when he was taken to Waterloo. The indictment was returned, as noted above, on August 9.

On August 23 the defendant first appeared in federal court in Waterloo for arraignment. The court read the indictment to the defendant and told him that because the death penalty could be imposed the charge was a very serious one. The court also advised him of his right to counsel and of the court's willingness to appoint counsel for him. The defendant stated that he desired to retain his own counsel from Chicago and that he had funds for this purpose but that "in this particular proceeding, I think, just to facilitate matters, that I can act in proper person". Neither Mr. Black nor Mr. Mitch was representing the defendant after his departure from Birmingham. The hearing was then continued.

A report, transcribed August 15, of the examination at Springfield was sent to the court. This was signed by "Richard A. Stamm, M.D., Staff Psychiatrist". It recited the nature of the charge against the defendant and that he was at Springfield for evaluation and "to obtain medical data concerning his ability to understand the nature of the legal proceedings pending against him and his abilities to assist counsel in his defense". His background was reviewed. It noted the patient's comments to the effect that he was never able to receive the love he wanted from his father and felt an abyss in his life for having no mother; that his youthful stealing was attributable to resentment toward his father; that while he was in prison at Jackson he was under almost constant homosexual pressure; that he read Freud and books about Islam and Buddhism; and that he denied being or ever having been mentally ill. It outlined medical comments (described below) accumulated during the defendant's Michigan incarcerations. It noted that the defendant maintained that he had a better chance of avoiding a death penalty by being tried by the federal government than by a state. It then observed that "The patient is well oriented as to time, place and person * * * His intelligence as judged by his rich vocabulary and ability to handle ideas would seem to be in the superior to very superior range. Emotionally he tries to keep himself well controlled by being detached and intellectual about himself and others. Occasionally he talks with a sneer of bitter, resigned hatred toward a world that he feels has given him little pleasure * * * He knows his behavior has been abnormal and has tried to relate it to his childhood experiences * * * The patient demonstrates some tremulousness as he alludes to the crime. The patient is knowledgeable of court proceedings * * * He has been unable to internalize self-control. He has been unable to adequately identify with socially acceptable goals for his life. He has depended on institutional living to afford him the controls that he lacks inside himself but apparently even in institutions he has had to either isolate himself from other people to avoid coming into direct conflict with them * * * Perhaps he also chooses crime as a way of dealing with his problems because it affords him a more justifiable reason to feel mistrust toward others and to isolate himself from others". Dr. Stamm's concluding diagnosis was "000-x44, Paranoid Personality, Severe, Chronic. * * * I believe that because of the nature and strength of his defenses, he is potentially able to react psychotically to additional, special stress".

The next hearing was at Waterloo on September 1. The court noted that no counsel had appeared for the defendant and repeated its advice that the court would appoint able and experienced attorneys for him without any cost to him. The defendant stated, "After giving the matter careful consideration, I have decided to act in proper person, exercising my own right to do so". He said he understood his right to court-appointed counsel. The court indicated that he would appoint attorneys to confer with the defendant although the defendant need not accept their services. It strongly recommended against the defendant's acting on his own behalf. It then observed that the Springfield report had

been received and that the substance of that report was that the examining psychiatrist felt the defendant understood the nature of the charges and was competent to proceed to trial. The court noted that in view of the report's contents no hearing was required. It asked the defendant whether he wanted a hearing. The defendant said, "No, I don't feel it's necessary". At the request of government counsel the court advised the defendant that he had the right to witnesses on his behalf at no cost to him. The defendant stated that at that time he did not know whether he wanted any witnesses called. The indictment was then again read to him. The defendant stated that he had not been given a copy of the indictment. A copy was given to him. He read it and said that he wished to plead nolo contendere. Upon the court's refusal to accept that plea, he pleaded not guilty. The court inquired as to whether there were any other documents he would like to have. He said he wanted a copy of the arrest warrant. He also asked about the bond posted in Alabama. The court announced that in view of the Springfield report no hearing on competency would be held. An order was entered whereby the court found that the defendant was mentally capable of understanding the nature of the proceedings against him and mentally competent to assist in his own defense.

On September 2 the court formally noted that the defendant had then asked that he be assigned counsel with whom he might confer. On September 9 and 16 defense counsel were appointed.

On September 30 the United States attorney, asserting that the government had reason to believe that the defendant's sanity as of July 11, 1960, would be raised as an issue requiring proof, moved for an order under Rule 28 to show cause why qualified psychiatrists should not be appointed as expert witnesses. At a hearing on October 15, at which defense counsel were in attendance, the defendant, in response to the court's question to him, stated that he was willing to have Judge Kildee appear for him

and that the representation by Judge Kildee and Mr. White had been satisfactory so far. At the same hearing, the parties agreed in open court that Dr. Stamm could be appointed as an expert witness. The court so appointed him and ordered a further examination of the defendant. The defendant was again transferred to Springfield. He remained under observation there from October 25, 1960, to January 5, 1961. He was returned to Waterloo on January 11.

In the latter part of January the court received the second Springfield report. This was signed "For the Psychiatric Staff: Richard A. Stamm, M.D., Staff Psychiatrist", and it stated that "staff members present" were Drs. Settle, Sturgell and Stamm. The report, dated January 5, referred to the charge against the defendant, noted that his background and present illness were "essentially unchanged" from that described in the August report and further noted that when the defendant was in the Iowa jail he went on a hunger strike for about five days and accumulated contraband in his cell "apparently for the purpose of attempted escape". It recited that the patient had been interviewed by Dr. Stamm for approximately six hours during November, December and January; that Dr. Stamm had been the patient's ward doctor for about two weeks of that period; that the patient continued to be tense and guarded and was controlling himself with effort; that he was oriented as to time, place and person; that during the interviews he was preoccupied thinking about what he should or should not tell the examiner; that he told of an instance where he experienced the presence of his mother in his cell and his ability to reach out and touch her dress; that he said this was a very real experience for him; that he said he was worried that the examiner might find him mentally ill; that he was able to talk about superficial happenings in his life; that he refused to shave for a time because, according to religious beliefs or philosophical principles, this was a preparation for death; that he said that not all

people are human; that on "the basis of his vocabulary and level of ideation his intelligence seems to be in the high average to superior range and remains essentially intact"; that institutional personnel thought the patient was potentially assaultive and perhaps suicidal although he made no suicidal gestures or communications; that his adjustment and thinking processes showed a gradual deterioration since his incarceration; that he had become more defensive and anxious about himself; and that indications of a thinking disorder had become more prominent. The diagnosis was:

"000–x 24 Schizophrenic Reaction, Paranoid Type, in period of exacerbation, manifested by: Looseness of association in thinking processes, inappropriate affect, hypersuspiciousness and religiosity, hyperintellectualization and evidence suggestive of hallucinations."

The report also embraced an opinion regarding the defendant's mental status on or about July 11, 1960. This included the background material and the Michigan medical comments. It observed that when the defendant was first seen in late July "he showed no gross evidences of psychosis"; that more recently there had been evidences of "severely unrealistic thinking"; that one must consider some of this mental decompensation in the light of the severe emotional pressure he was under by virtue of his uncertainty as to the final disposition of his legal problem; that the defendant's behavior "has been affected in some degree by a mental illness"; that one could assume that his schizophrenia had been affecting his behavior for many years; that the degree of effect was more difficult to determine; that "we have no definite evidence from the patient's past history or from his present psychiatric examination that his thinking has been impaired to a degree to render him incapable of understanding what is legally right or wrong or the legal and physical consequences of his actions"; that "one could formulate that the patient had been suffering a prolonged mental illness of a schizophrenic

and sociopathic type"; that during "most or all of this illness he has probably been able to consider the legal implications of his behavior to the extent of present information about him"; and that "the possibility cannot be dismissed that a crime of violence on his part could represent a sicker condition of mind than is usual for him, or than has been identified in the past".

The defense moved for a hearing, pursuant to § 4244, to determine the mental competency of the defendant to stand trial. The hearing was held February 20. Dr. Stamm appeared as a court witness. He was the only person who then testified. The hearing was lengthy. The doctor was examined by the court and by counsel for both sides. The two written reports were before the court. The record discloses substantial prehearing comment between court and counsel. The court stated to the United States Attorney that if, when Dr. Stamm's examination was complete, "you need time to summon other witnesses, I am here. I have not set anything else this week because I wanted to complete all these matters". The court also said, "We can go as far as we can with Doctor Stamm and then we can continue the matter until we get the thing handled the way it should be handled", and "if it is necessary to have other evidence, you can do it. I do not think you are just bound by what the one witness said. You could have extensive hearings * * * Counsel, in effect, state that his condition has deteriorated since the * * * first examination was made * * * but, I mean, this hearing is not restricted to just Doctor Stamm this morning * * * He may not be the only witness heard, it depends upon what develops, and the hearing is not limited to one witness * * * * ". Government counsel stated, "That is what I wanted to maintain to keep the record in condition so that we could go ahead with a little further evidence".

Dr. Stamm at this hearing testified that he was 33 years old; that he graduated from medical school in 1955; that

he took his internship the following year and post-doctorate residency in psychiatry at the Menninger Foundation from 1956 to 1959; and that since 1959 he had been at Springfield as a ward psychiatrist and as assistant chief of the neuro-psychiatric service. The doctor acknowledged that when the defendant was first examined they at Springfield felt he was competent to stand trial. He stated that there had been much anti-social behavior in the defendant's lifetime; that he was seeing his environment in an unrealistic way; that they gave him a diagnosis of paranoid personality which is "simply that he has an excessively suspicious type of personality"; that people with this problem have difficulty in being able "to relate themselves to people in a relaxed, friendly, trusting manner"; that they then saw other trends in him which made them wonder whether under greater or more prolonged stress "he might not start acting psychotically to his environment"; that the defendant felt lost; and that while some of these symptoms would be expected to occur in a person in his position, his suspiciousness seemed to be in excess of that ordinarily expected. He went on to state that on the second examination some of these tendencies became exaggerated; that this was more of degree than quality; that the patient remained well oriented as to time, place and person; that the casual observer "would say that he was in contact with reality and to this degree, he certainly was"; that as his tension increased a thought disorder began to emerge; that he became "overly intellectualized", preoccupied with religious symbolism, and more distrustful and unrealistic; that he would experience what seemed to be visual hallucinations; that on the basis of the tests administered a deterioration or an increase in his unrealistic thinking and emotional confusion was in evidence; that on these symptoms they diagnosed him as then suffering from a schizophrenic reaction of a paranoid type; that this represented a further decompensation from the earlier diagnosis of paranoid personality; that "his understanding of the nature of the legal proceedings pending against him and his ability to assist counsel in his defense would be * * * more limited than it had been in the past"; but that "within the context of his mental illness we still feel that he could probably * * * understand, at least factually, the nature of the legal proceedings pending against him". To this point Dr. Stamm's examination, except as to his qualifications, had been conducted by the court.

In the United States Attorney's examination the doctor testified that he had never found the defendant when he was not oriented as to time and place; that any patient at the institution is expected to have a certain reluctance to discuss his case; that part of this defendant's resistance was predicated on a thought disorder; that evasiveness in responding to inquiries could be a normal reaction but could also be an abnormal one; that they felt this defendant was evasive because he was confused about the meaning of the crime and the meaning of his present situation; that there is also some conscious component to his evasiveness but, as well, some actual confusion of thought; that the defendant's mental illness was more profound than hysteria; that his mental illness was longstanding; that the defendant had no real loyalties; that he was callous, hedonistic, emotionally immature, and lacked a sense of responsibility and judgment to rationalize behavior; that the doctor concluded he had hallucinations "Only by what he has told me"; that he admitted to no auditory, olfactory or taste hallucinations; that a patient cannot really lie about himself to a psychiatrist; that the defendant was emotionally confused; that this limited his being able to understand the nature of the legal proceedings against him and his being able to assist counsel in his own defense; that his thoughts were impaired; that the difference between the first and the second examinations lay in his hallucinations and in an exaggeration of the tendencies seen in the first examination "so that taking them all

together his contact with reality has become more tenuous"; that the point between the presence and absence of schizophrenia is difficult to ascertain; that the defendant, who was present at the court hearing "knows probably where he is and what we are talking about"; that he would have much difficulty in being able to understand the nature of the legal proceedings pending against him and in being able to assist counsel because of his thinking disorder and emotional disorder; that his ability may not be as great now as it was at some previous time; that "I am not saying he has that ability. I don't know. Not being a lawyer, I don't know"; and that the defendant does know what the charges are.

On the examination by defense counsel Dr. Stamm stated that schizophrenia had elements of withdrawal from reality and of a split between emotion and thinking; that it was usually of long duration; that it was a way of living; that we all do this to an extent; that it may become progressively worse or progressively better; that the defendant might feel evasive and suspicious toward anyone in authority including his attorneys; that his illness and thinking disorder could result in his giving a false factual statement to his lawyers; that schizophrenia was a very severe and serious mental illness; that at the time of the first report the defendant was on the verge of schizophrenia; that there was an apparent loss of memory between the first and second examinations; that this would interfere with his present ability to consult with his attorneys; and that the opinions he was expressing were on behalf of all three doctors comprising the staff group.

On further examination by the prosecution, Dr. Stamm acknowledged that one did not have to be psychotic in order to give his lawyers false statements or to be evasive. In response to questions by the court, he said that this defendant "is not a completely deteriorated, disorganized person" but that he "does have a very severe thinking and emotional disorder which would severely limit him from assisting counsel in his defense and rationally and factually understanding the nature of the legal proceedings against him. In comparing him to other patients that we see to make this recommendation, I would think that he is probably incompetent, not competent, to do the things that are required of him in the courtroom study at the present time".

At the conclusion of the hearing the court stated that Dr. Stamm's evidence was submitted along with other evidence and ruled from the bench that the defendant was able to understand the proceedings against him, was able properly to assist in his own defense, and was competent to stand trial. This was confirmed by written order filed the same day.

On March 10, after all the trial evidence was in, but before the closing arguments, a further hearing on the question of the defendant's competency to stand trial was held. This was over the objection of the defense. The court took the position that it had agreed to give the parties additional opportunity to present evidence. At this hearing a deputy United States marshal who had transferred the defendant from Waterloo to Springfield in October 1960 and who had been assigned the duty of caring for the defendant during the trial, testified that when he took the defendant from the Waterloo jail to go to Springfield, he conducted a routine search and discovered in his possession an electric light bulb filament which could be used to open a pair of handcuffs; that on March 2, after the trial proceedings for that day had been concluded and the defendant had been returned to the county jail, a routine search of his clothing was made; that in the defendant's left shoe two hacksaw blades were then discovered; that the defendant "said that we had him cold"; that the defendant showed him where he had sawed through one of the bars in his cell; and that, however, he did not tell where he had acquired the blades. On cross-examination, this witness stated that another prisoner, a trusty, was working on leather goods outside the defendant's cell and that he was us-

ing sharp knives and instruments in his work. A jailer, who had been deputized as special United States marshal, testified to the same effect. He also said that the examination of the shoes had been made at his suggestion; that the defendant kidded him about this; that while the defendant had been confined he had played cards with him; that the defendant played in a carefree manner and did not seem worried; and that he joked and laughed every night but showed concern at different times.

Dr. Stamm was also a witness at this hearing. He testified that when the defendant was at Springfield he was kept in the hospital's maximum security unit and in the acute intensive treatment ward; that these provide the patient with maximum supervision under maximum security conditions; that while there he was isolated from contact with other patients as much as possible; that isolation might increase the defendant's psychiatric difficulties and could accentuate the possibility of thought disorder, hostility, suspiciousness and hallucinations; that the defendant had expressed a preference to be back in Waterloo rather than in Springfield; that the defendant on that day, March 10, "seemed more relaxed than he had seemed to be" in their previous contact and that "he had an easier time in making a relationship with me"; but that this contact was for only three or four minutes. On cross-examination by defense counsel he stated that the hacksaw incident "might possibly mean that the patient was able to guide himself, his thinking and his behavior, toward a short-range goal * * * that what we are seeing here is the patient reintegrating himself well enough, at least, to go ahead and * * * plan an escape attempt from the jail". On redirect he stated that one could infer that he had enough grasp of reality to procure the blade and secrete it and to have the goal of escaping which would mean that in this area "he was in contact with reality in order to do these things".

At the same hearing, Dr. Frederick M. Stark, a board certified physician specializing since 1949 in neurology and psychiatry in Sioux City, Iowa, who that morning had been a witness at the trial itself, also testified. He was shown the defense's pretrial motions to suppress evidence, for return of property, for amendment of motion to suppress, and for discovery and inspection, all of which had been verified in writing by the defendant in January 1961 and three of which contained as appended exhibits lists of property seized in Birmingham. He was asked to assume that the verifications were true, that the items listed on the exhibits were taken from the defendant in July in Birmingham, that they were vital elements of evidence in the trial, that if they were suppressed the defense would be most materially aided, that present defense counsel never met the defendant until after he had been returned to Iowa, and that the several motions were all made subsequent to his second examination at Springfield. The witness said that on these assumptions it was his opinion that the defendant had capacity to aid counsel; that he knew what this evidence meant; and that he had a rational as well as a factual understanding and appreciation of the proceedings against him. The defense was given the opportunity to present additional evidence on the subject but did not do so.

On March 11 the court entered an order reciting "that it has been clearly established that during this trial and proceedings prior thereto the defendant had the present ability to consult with his attorneys with a reasonable degree of rational understanding and has had a rational as well as a factual understanding of the proceedings against him and that he has been and is competent to stand trial and properly assist in his defense".

*Evidence on the Insanity Issue.* At the trial itself Dr. Stamm testified as a court witness. In response to questions from the court he stated that, based solely upon his examination of the defendant at Springfield from October 1960 to January 1961, he believed the defendant to an

extent knew right from wrong on July 11, 1960; that he had no reason to believe that the defendant did not know the harmfulness of a criminal act; and that he had no evidence that he had delusional thinking and to this extent he probably could have resisted an impulse to hurt someone. On examination by defense counsel he reviewed the defendant's background as his file disclosed it. He said that the defendant had very hostile fantasies toward significant people in his earlier life; that his entire social behavior was symptomatic of this rebelliousness; that he made a diagnosis of paranoid personality disorder, severe, chronic; that the defendant acted inappropriately hostile to him; that this had to do with the ability of the patient to assess the reality in which he was living; that this was a symptom of a mental imbalance; that the patient was extremely tense; that he possessed relative lack of tenderness or warmth toward others; that paranoid personality is often very close to being psychotic; that such a personality under conditions of stress could move over into psychosis; and that a paranoid personality is one who is suffering from a mental illness. The foregoing had to do with the witness's first examination of the defendant.[6] He testified that as to the second examination his diagnosis was schizophrenic reaction, paranoid type; that schizophrenia is considered to be a psychosis; that there are no known organic reasons for schizophrenia; that he found symptoms of schizophrenia present, namely, loosening of associations, inability at times to keep thoughts in a straightforward coherence; hypersuspiciousness, religious preoccupations, a touch hallucination, and emotional inappropriateness; that he did not think the patient was consciously feigning this; that the split between the intellectual life and the emotional life is the root of schizophrenia; that he had

much more opportunity to see the defendant during the second examination than during the first; that the defendant's psychosis was sufficiently severe to require treatment in a mental hospital if he were a private patient; that the making of schizophrenic illness is of long standing duration; that there are all gradations of retreat from reality in schizophrenia; that the defendant was autistic, that is, possessed of an excessive amount of fantasy; and that this is often seen in schizophrenia. On examination by the United States Attorney, Dr. Stamm stated that the defendant was at all times under maximum security at Springfield; that he was aware of the charges against him and why he was being held; that this was an extremely stressful period for him; that he knew the doctor was a government physician; that the physicians were never able to elicit any clearcut, well-organized delusional system in the patient; that it is normal for one in prison to be hostile and tense; that, however, this was in excess in the defendant; that there was evidence of the defendant's being a sociopath; that a sociopath was one who had difficulties in getting along with society; that an habitual criminal was a type of sociopath; that the defendant showed no evidence of loyalty or true affection; that he was callous to the troubles and rights of other people, immature, selfish and ungenerous; that he had an ability to rationalize and justify his own behavior; that he certainly used sociopathic defenses; and that maximum security confinement at Springfield could very well have a pathological effect on a normal person and increase stress.

The prosecution, in its rebuttal, called Dr. Stark. He testified that a diagnosis of paranoid personality meant that the patient was more suspicious and more distrustful of other people than the normal person; that this was very common;

---

6. The defense indicated, both in its opening statement and to the court before Dr. Stamm took the stand, that it wished to go into the period of both examinations at Springfield. The privileged character, under 18 U.S.C. § 4244, of the reports was thus waived. Bailey v. United States, 1957, 101 U.S.App.D.C. 236, 248 F.2d 558, 560, cert. den. 355 U.S. 919, 78 S.Ct. 351, 2 L.Ed.2d 279.

that it did not imply a psychotic condition; that these people were considered to be sane and mentally competent; that it did not interfere with their self-control; that a person of this character could develop a schizophrenic reaction, paranoid type, and would then be considered psychotic; that a borderline schizophrenic reaction was a condition where one had some symptoms of schizophrenia but not severe enough to make a positive diagnosis; that a sociopath was a person who acts out against society and violates its moral standards; that many sociopaths would be criminals; and that a sociopath could be one who was constantly in trouble with the law, who had no regard or real feeling for others, who did not profit from experience, who could rationalize his own behavior and who had a poorly developed conscience. Dr. Stark was then asked a record-based hypothetical question. Over objection the witness stated as his opinion that on July 11, 1960, the defendant had the reason and capacity to understand the difference between right and wrong; that on that date he understood the nature and character of a criminal act and its consequences; and that at that time he was not under the influence of an irresistible impulse.

On cross-examination Dr. Stark acknowledged that he had not examined the defendant and had never seen him until the trial; that it was possible for the sociopathic tendencies he described to rest above an underlying schizophrenia; that when one said to be a borderline schizophrenic is placed under additional stress he could go into a schizophrenic state; and that it was not common but was possible that underlying schizophrenia is masked. On redirect he stated that it was possible for a borderline schizophrenic to distinguish between right and wrong; that in most cases a borderline schizophrenic would be referred to a hospital for treatment; that each case had to be considered on its own; and that it was easy to confuse the borderline schizophrenic reaction with an out-and-out sociopathic reaction.

A former counsellor at the Jackson prison, called as a defense witness, testified that he was a graduate of the School of Police Administration at Michigan State University and possessed credits toward a master's degree in psychology; that there were approximately 3,500 inmates at the Jackson prison at any given time; that there were ten counsellors for these men; that while he was there, from December 1957 on, he had a personal case load of about 320 inmates; that his task was to become acquainted with the men, to handle routine problems and to select those "who you felt you could work with and engage in counselling activities with"; that he saw the defendant seven times; that the defendant had "difficulty in relating to other people" and was evasive and hard to get information from; that he had a distant or remote attitude; that he was very polite and reserved; that from an interview on October 30, 1959, he was of the opinion that the defendant's mental condition (as distinguished from a psychiatric diagnosis), based upon a note received from the defendant, was confused and the defendant "had internalized ideas and problems" and confused thinking. On cross-examination he said that in his experience it was usual and normal for prisoners to be evasive with prison administrative personnel and suspicious of their motives. On redirect he stated that as compared with other prisoners the defendant possessed more inability to make contact.

Herbert Edwin Thomas, a 32-year old physician-psychiatrist, was called as a witness for the defense. He had completed his residence in psychiatry in June 1960 and since that time was director of the psychiatric clinic at the Jackson prison. He testified that he and one resident were the only psychiatrists for the entire Michigan State Department of Corrections and had supervision over 9,000 men; that of the men in the Jackson prison there were at least 700 who would be immediately committed to a state hospital "if there were any facilities to take them"; that in February 1960 it had

been more than 20 months since the prison had been able to transfer anyone to a state hospital and if a prisoner were so transferred the hospital "would send me somebody in return"; that he saw the defendant once for about twenty minutes on February 23, 1960; that this interview was "to determine for my own satisfaction whether he was so confused that he literally, if allowed out of the prison, would not be able to find his way around"; and that the prison records contained a note by the then clinical psychologist that on June 2, 1951, when the defendant was about 16 years old, he was referred for examination because "he was despondent over the recent suicidal attempt of his partner in crime" and the "only solution to his problem is to follow in the action of his friend". He said that the file also contained a report, dated March 25, 1957, of a prison psychiatrist that the defendant had been "in the disciplinary block" on innumerable occasions for serious infractions such as carrying a weapon; that he came up with "some fantastic rationalizations about why he carries these weapons"; that he was suspicious and paranoid relative to what had been going on around him; that their psychologist felt he was a chronic paranoid individual; that he tended to be over-literal, suspicious, guarded, and defensive, "ruminated at great length about whether he is or is not insane", and used his tuberculosis to have himself relieved from a stressful situation; and that "this man is a borderline schizophrenic reaction who, at best, makes an adjustment at a severe character disorder level of psychopathic nature" and probably represents "a pseudo-psychopathic schizophrenia who seems to be deteriorating over the years". He also said that on July 2, 1957, the same physician again interviewed the defendant and noted that he was upset about having been put on a "blue hold card" shortly after the last interview; that he presumed the doctor had arranged for this; that "It still is

my feeling that this man is a schizophrenic individual who will bear close supervision"; and that he should be placed back on a blue hold card when he is released from the hospital after his tuberculosis was better. The witness testified that in his own twenty minute conference with the defendant, "he was not grossly confused at that time"; that "because I felt he was not psychotic and his thinking seemed to be fairly clear, I felt he would be able to certainly find his way around in the community"; that "his behavior during this past six months represents a marked improvement over previous months"; and that in February 1960, there was "certainly no evidence of any schizophrenic process".

An uncle of the defendant and his wife both testified that until the defendant was about 11 he acted normally. The uncle said that after the defendant had been in prison at Jackson he was not normal and the wife said that then they couldn't believe a word he told them. The manager of the Milwaukee rooming house thought that the defendant in June 1960 was "somewhat of a strange person"; that he had a far away look; that he did not act as a normal person, and that he always opened the door of his room furtively. The manager, however, allowed the defendant to retain the keys to most of the apartments and to collect the rents. The wife of this witness, who possessed a college degree with a psychology major, regarded the defendant as uncommunicative, as ill at ease, and as not acting as a normal person would. The chief of police at St. Johns, Michigan, who had known the defendant since he was born, felt that in his youth he did not act normally.

There was opposing lay evidence. The Kroger store in Ohio gave the defendant employment tests before hiring him; on these he received good grades except as to interest. Twenty-two lay witnesses testified generally that he was normal.[7]

7. These were the Kroger store manager; an employee of the Broadview restaurant; a co-worker on the Milwaukee janitorial service; 3 of the tenants at the Milwaukee rooming house; the gun salesman; the Dubuque taxi driver who drove him

Any suggestions of abnormality, so far as lay witnesses were concerned, seemed to be directed to the defendant's quietness, his wearing of good clothes on rough jobs, his occasional expressions of interest in religion, and his nervousness and evasiveness.

The defendant did not take the stand.

The points asserted by the defense are considered in order:

1. *Competency to stand trial.*

■■ Section 4244 of 18 U.S.C. calls for a "judicial determination" of an accused's "mental competency" to stand trial and provides that when a hearing is required the court shall "make a finding" as to the accused's mental condition. This is a finding of fact to be made by the trial court and its determination is not to be set aside on review unless clearly arbitrary or unwarranted. Dusky v. United States, 8 Cir., 1959, 271 F.2d 385, 397, reversed, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824, on suggestion of the Solicitor General as to the insufficiency of the evidence in that case. As the Supreme Court there said,

> " * * * it is not enough for the district judge to find that 'the defendant [is] oriented to time and place and [has] some recollection of events,' but that the 'test must be whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him.' "

This, therefore, is our standard here. It is the standard which the trial court in its findings definitely purported to use. See also Dusky v. United States, 8 Cir., 1961, 295 F.2d 743, 746, cert. den. 368 U.S. 998, 82 S.Ct. 625, 7 L.Ed.2d 536.

■ Presence of a mental illness does not equate with incompetency to stand trial. Lebron v. United States, 1955, 97 U.S.App.D.C. 133, 229 F.2d 16, 18, cert. den. 351 U.S. 974, 76 S.Ct. 1035, 100 L.Ed. 1492; Lyles v. United States, 1957, 103 U.S.App.D.C. 22, 254 F.2d 725, 729, cert. den. 356 U.S. 961, 78 S.Ct. 997, 2 L.Ed.2d 1067; Smith v. United States, 9 Cir., 1959, 267 F.2d 210, 211. See Lee v. Wiman, 5 Cir., 1960, 280 F.2d 257, 265, cert. den. 364 U.S. 886, 81 S.Ct. 176, 5 L.Ed.2d 106. And even expert opinion on competency rises no higher than the reasons on which it is based; it is not binding upon the trier of the facts. Dusky v. United States, supra, p. 397 of 271 F.2d; Gunther v. United States, 1954, 94 U.S. App.D.C. 243, 215 F.2d 493, 496–497. See Dusky v. United States, supra, p. 754 of 295 F.2d and cases cited.

■ The present record, of course, discloses cruel misfortunes in the defendant's life: the inadequacy of his father; that parent's literal abandonment of his son; the loss of his loved and respected mother at an early age; his being tossed about among relatives and institutions during the decade following; the lack of guidance and helpful discipline; and the Michigan incarceration in his impressionable years from 15 to 20 and again, after a short period of freedom, from 20 to 24. The record also discloses his 1956 diagnosis in the Michigan prison as a paranoid personality and his 1959 diagnosis there as one possessing a borderline schizophrenic reaction and as using a severe degree of sociopathic defense to ward off a more severe decompensation or psychotic process.

It also contains evidence from Dr. Stamm which may be viewed as favorable to the defense: There is the statement in his first Springfield report of August 1960 that defendant was "po-

---

to the Bluff Street address; the woman who rented him the room there; the clerk at the Dubuque loan company; the proprietor of the Dubuque grocery where he purchased provisions; the teller at the Dubuque bank; the proprietor of the Dubuque music store where he purchased

the radio; the shoe store proprietor; the employee of the luggage shop; the clerk in the Dubuque Penney store; the Dubuque used car salesman; the Gary car salesman; 3 Gary filling station operators; and the clerk in the Gary Penney store.

tentially able to react psychotically to additional, special stress". There are the notations in the second Springfield report of January 1961 as to the defendant's story of the presence of his mother in his cell; his refusal to shave for a period; the feeling of hospital personnel that he was potentially assaultive and perhaps suicidal; the gradual deterioration in adjustment and thinking processes; the diagnosis of schizophrenic reaction, paranoid type; and the conclusion that his behavior was affected in some degree by a mental illness and that he was suffering from a prolonged mental illness of schizophrenic and sociopathic type. Dr. Stamm's testimony on February 20 emphasized that there was evidence of a deterioration or increase in the defendant's unrealistic thinking and emotional confusion; that the diagnosis of schizophrenic reaction represented a decompensation from the earlier diagnosis of paranoid personality; that his understanding and ability to assist was more limited than in the past; that "he would have much difficulty in being able to rationally and factually understand the nature of the legal proceedings pending against him and in being able to assist counsel in his defense"; that his thinking disorder and his emotional confusion would interfere with his ability to understand and assist; that in comparison with other patients with respect to whom they made recommendations to the court the defendant "would probably * * * be incompetent to understand rationally and factually the nature of the legal proceedings pending against him and thereby to assist counsel in his defense"; that "because of his mental disorder, he could not factually and rationally assist counsel in his defense, or rationally and factually think through the ramifications of the consequences of the alleged act * * * this patient is not a completely deteriorated, disorganized person, he isn't in any sense of the word, but he does have a very severe thinking and emotional dis-

order which would severely limit him from assisting counsel in his defense and rationally and factually understanding the nature of the legal proceedings against him."

But Dr. Stamm's reports and testimony are by no means entirely and consistently favorable to the defense. He noted in both reports and in his testimony that the defendant was well oriented as to time, place and person.[8] His first report recited that at the time the defendant "was knowledgeable of court proceedings" and it gave him a diagnosis of paranoid personality, not of schizophrenia. His second report contained the observation that the defendant's intelligence was high average to superior and was essentially intact; the acknowledgment that some of his mental decompensation must be considered in the light of the severe emotional pressure he had been under because of the criminal charge; the statement (although contained in that part of the report directed to the situation as of July 11, 1960) that Springfield had no evidence from the defendant's history or from his present examination "that his thinking had been impaired to a degree to render him incapable of understanding what is legally right or wrong or the legal and physical consequences of his actions"; and the further statement that while he was suffering a prolonged mental illness of a schizophrenic and sociopathic type, during most or all of this illness "he has probably been able to consider the legal implications of his behavior to the extent of present information about him". At the February 20 hearing the doctor acknowledged that at the time of first report he felt the defendant was competent to stand trial and that at the time of the second report the staff felt he could probably understand, at least factually, the nature of the legal proceedings against him. At the March 10 hearing Dr. Stamm acknowledged that the defendant's maximum security incarceration might have increased his

8. This, in and of itself, of course, is insufficient. Dusky v. United States, quoted supra, p. 402 of 362, U.S., p. 789 of 80 S.Ct.

psychiatric difficulties at Springfield; that, although the contact was short, he had observed the defendant's greater relaxation on March 10 as compared with Springfield; and that the hacksaw incident could mean the defendant was able to guide himself toward a desired escape and he had contact with reality in order to do that.

Also, Dr. Stamm's testimony is not the only evidence in the record on the competency issue. At the hearing of March 10 Dr. Stark, upon the assumption given him as to the January 1961 defense motions and their verification by the defendant, flatly stated that in his opinion the defendant had the capacity to aid counsel, that he had a rational as well as a factual understanding of the proceedings against him, and that he knew what the evidence meant. We have, in addition, the defendant's February 1960 examination at the Michigan prison with its conclusions of "marked improvement over previous months" and "certainly no evidence of any schizophrenic process"; the defendant's conduct at the first Iowa pre-arraignment hearing on August 23, 1960, when he gave obviously intelligent answers to questions from the court, when he spoke of his desire to retain his own Chicago counsel, and when he even correctly used and thus displayed familiarity with the technical words "in proper person"; the defendant's additional intelligent remarks at the arraignment on September 1, 1960, and his further use of the same technical term; his acquaintance with "nolo contendere" and his attempt to enter that plea at the hearing; his then insistence upon having a copy of the arrest warrant; his awareness of the Alabama bond and his inquiry about its use in Iowa; his passing of judgment at the hearing on October 15 as to the quality of services rendered by his court-appointed attorneys; his acquisition in October of the bulb filament for opening handcuffs; his verification in January 1961, within a short time after his second examination at Springfield, and his thereby obvious rendition of assistance to counsel, of the several and very important motions to suppress, for return of property, and for discovery and inspection, three of which had appended lists of property seized at Birmingham before trial counsel were appointed; the identity of the factual content of these motions which he verified with prosecution testimony later introduced at the trial; his acquisition and possession during the trial of hacksaw blades in his shoes; his using them to saw cell bars; his acknowledgment that the discovering officers "had him cold"; his refusal to reveal the source of the blades; and his preference for the comparative freedom of the Waterloo jail, with the trusty working nearby, over the maximum security of Springfield.

This evidence, viewed in the aggregate, prompts us to repeat what we said in our second Dusky opinion, supra, p. 755 of 295 F.2d:

> "Because we are subject to the natural and ever present judicial desire for absolute certainty, we might wish as always that the evidence consisted entirely of positive blacks and whites and was not flecked with some greys".

Compare Greenwood v. United States, 1956, 350 U.S. 366, 375, 76 S.Ct. 410, 100 L.Ed. 412. Nevertheless, the case must be decided. And in the light of the evidence, again viewed in its entirety, we, as an appellate court, unpossessed of the power to make our own determination of the ultimate fact, of the power to pass upon the wisdom of capital punishment and of the power to dispute the jury's recommendation of the death penalty, certainly cannot say that on this record the trial court's determination of competency was arbitrary or unwarranted. We necessarily conclude that there is sufficient material here upon which the trial court could adequately rest its finding of competency.

The defense at this point, however, presses upon us three ancillary arguments:

(a) It has supplied us with a copy of the then Solicitor General's memorandum

to the Supreme Court suggesting remand in the first Dusky case and it urges that what was said there is equally applicable here. Granting the propriety of the Solicitor General's proposition (as we must, in view of the court's adoption of it, p. 402 of 362 U.S. p. 789 of 80 S.Ct.), we are, nevertheless, not persuaded that a similar result is to ensue here. The competency evidence presented prior to the first Dusky trial, as described in detail in this court's opinion, pp. 387–389 of 271 F.2d, while perhaps somewhat equivocal, was far stronger on the side of incompetency than here. There the Springfield staff in its first report stated flatly that the patient "is unable to understand the nature of the proceedings with reference to the charges against him and is unable to properly assist counsel in his defense". In its second report, three months later, it stated that the defendant was mentally ill with a diagnosis of schizophrenia and "is unable to properly understand the proceedings against him and unable to adequately assist counsel in his defense". The staff physician who testified orally expressed the opinion that that defendant would be unable properly to assist his attorney in his defense and also testified that the accused's discussion with his counsel could result in a false factual statement. This court's first Dusky opinion was largely concerned, on the competency issue, with the problem of the extent the trial judge was required to go along with the opinion of the medical center's psychiatrists. In the present case, Dr. Stamm's opinion on competency is far less positive and, as noted above, can fairly be said to involve probabilities and possibilities. In addition, we have the extensive other evidence described. Finally, the Solicitor General's recommendation in Dusky appears to rest primarily upon two things: the defendant's hallucinations and his need for medication. The latter factor is entirely absent here. There is in this case only the one instance, and that merely recounted by the defendant, of a visual hallucination as to the presence of his mother in his cell.

(b) The claimed impropriety of the supplemental hearing of March 10. This is attacked, specifically, as a nunc pro tunc determination of the issue of competency.

It is true that the trial court on September 1, 1960, with the first Springfield report before it, ruled that that report did not, under the standard prescribed by § 4244, require a hearing, Krupnick v. United States, 8 Cir., 1959, 264 F.2d 213, 217; Coffman v. United States, 10 Cir., 1961, 290 F.2d 212, 214, and that the defendant was competent to stand trial. It is also true that the court on February 20, 1961, with the second Springfield report before it and after the competency hearing on that date held in response to the defense motion, again found that the defendant was competent to stand trial. But the record shows that at the beginning of the hearing on February 20, the court indicated that it was available to receive evidence in addition to the then available testimony of Dr. Stamm. Perhaps the court's comments could be argued to mean only such further testimony as might be produced on that day. We see no reason, however, so narrowly to construe the court's remarks or to suspect that their broader interpretation was not clear to each side.

The tone and obvious intent of § 4244 are apparent. That statute provides machinery for the judicial determination of mental competency over a wide period of time and, indeed, at any time "prior to the imposition of sentence". It also provides for the taking of evidence "including that of the reporting psychiatrist" and thus clearly indicates that evidence other than that of the psychiatrist is submissible. The court at the time of the March 10 hearing could have ordered another examination even then and held still another full hearing under the statute. Compare Ruebush v. United States, 10 Cir., 1953, 206 F.2d 810, 812. The court is necessarily engaged in a search for truth. We see nothing in the holding of the supplemental hearing, during the course of the trial and outside the presence of the jury, which is contrary

to the policy or provisions of the statute. We hold that the hearing was permissible and proper and did not constitute reversible error.

(c) The claimed misinterpretation by the trial court of Dr. Stamm's testimony in that the doctor's characterization of the defendant as "probably" incompetent was directed to the August 1960 examination rather than to the second Springfield examination. We have given serious consideration to this argument. The two written staff reports, of course, speak for themselves. It may well be that one can at least argue that the trial court, in the detailed hearing on February 20 did overly inquire of Dr. Stamm whether his view was based on probability and did too often indicate that he felt the Springfield reports were specific. Our reading of the entire record of that hearing, however, convinces us that the district judge devoted every effort, and not improperly, to ascertain to his own satisfaction what the exact conclusion of Dr. Stamm was. We also have in mind that the court's questioning was in the light of a statute which emphasizes, with respect to its requirement for hearing, only reports which positively indicate a state of insanity or mental illness. After a critical examination of all of Dr. Stamm's testimony on the competency issue, we conclude that at best, so far as the defense position is concerned, his testimony was equivocal and was not of such character that it, together with all the other competency evidence, "does not sufficiently support the findings of competency to stand trial", as the Solicitor General described the Dusky record.

In summary, therefore, we feel that the record here adequately supports the finding that, within the Supreme Court's standards announced in Dusky, this defendant had sufficient present ability to consult with his counsel with a reasonable degree of rational understanding and that he had a rational as well as a factual understanding of the proceedings against him. We would be inclined ourselves to conclude that his understanding in these respects was not only rational but well developed. This point therefore must be decided against the defense.

2. *The refusal to subpoena two psychiatrists as defense witnesses at government expense.*

■ Before the trial the defense made motions, pursuant to Rule 17(b), F.R. Cr.P., for the issuance of subpoenas at the government's cost. Among the witnesses desired were Dr. Russell O. Settle, Warden, and Dr. Joseph C. Sturgell, staff physician, of the Springfield Medical Center. To the extent these motions concerned Drs. Settle and Sturgell, they were ultimately resisted by the government on the ground that any material testimony from these physicians would be only cumulative to that of Dr. Stamm. The court initially granted the motion as to them, later reserved final decision, and then on March 4, after Dr. Settle by letter had stated that Dr. Stamm would present the official view of the institutional staff, that he and Dr. Sturgell could present little additional information, and that he was concerned over the crippling loss of staff time, denied the motion as to these two proposed witnesses. Every other request of the defense for witnesses at government expense was granted.

The defense position is that Dr. Settle's letter-comments are hearsay, that under the Sixth Amendment a defendant's right to compulsory process is not a matter to be determined by the prosecution or the witness; that we are concerned here not with cumulative factual material but with a need for all psychiatric evidence available; and that the court's ruling was an abuse of discretion.

The record does disclose that the three doctors named constituted the staff group which examined the defendant. The record is also clear, however, and quite apart from Dr. Settle's letter, that Dr. Stamm was the physician primarily concerned with responsibility for and the actual examination of the defendant; that Dr. Stamm was produced as a court witness at the competency hearings and

also at the trial; that he was extensively examined, not only by the court, but by both sides; that his testimony on February 20 was specifically on behalf of all three physicians; that all concurred in general with what was written in the January 1961 report; and that that report was for the psychiatric staff consisting of the same three physicians. Neither the motion nor the record discloses that the other two or either of them could have added any different material testimony.

■ We naturally appreciate that the Sixth Amendment's guaranty of compulsory process for an accused is, as the defense claims, a fundamental right and one "which the courts should safeguard with meticulous care". Bridwell v. Aderhold, N.D.Ga., 1935, 13 F.Supp. 253, 254–255, affirmed sub. nom. Johnson v. Zerbst, 5 Cir., 92 F.2d 748, reversed on other grounds 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461. But it has been observed, too, that this right does not necessarily include the payment by the government of the expenses of witnesses. Casebeer v. Hudspeth, 10 Cir., 1941, 121 F.2d 914, 916, cert. den. 316 U.S. 683, 62 S.Ct. 1272, 86 L.Ed. 1755; Neufield v. United States, 1941, 73 App.D.C. 174, 118 F.2d 375, 385, cert. den. sub. nom. Ruben v. United States, 315 U.S. 798, 62 S.Ct. 580, 86 L.Ed. 1199; Wallace v. Hunter, 10 Cir., 1945, 149 F.2d 59, 61; Brewer v. Hunter, 10 Cir., 1947, 163 F.2d 341, 342. Accordingly, where government expense is involved, a discretionary standard prevails. This court has said,

"It is well settled that Rule 17(b) * * * under which the motion for subpoena was made, does not accord the indigent defendant an absolute right to subpoena witnesses at government expense. There is and must be wide discretion vested in the District Court to prevent the abuses often attempted by defendants. This Court will not disturb the exercise of the discretion unless exceptional circumstances compel it."

Reistroffer v. United States, 8 Cir., 1958, 258 F.2d 379, 396, cert. den. 358 U.S. 927, 79 S.Ct. 313, 3 L.Ed.2d 301. To the same effect generally are Murdock v. United States, 10 Cir., 1960, 283 F.2d 585, 587, cert. den. 366 U.S. 953, 81 S.Ct. 1910, 6 L.Ed.2d 1246, and Burgman v. United States, 1951, 88 U.S.App.D.C. 184, 188 F.2d 637, 641–642, cert. den. 342 U.S. 838, 72 S.Ct. 64, 96 L.Ed. 1347. See also Goldsby v. United States, 1895, 160 U.S. 70, 73, 16 S.Ct. 216, 40 L.Ed. 343; Gibson v. United States, 8 Cir., 1931, 53 F.2d 721, 722, cert. den. 285 U.S. 557, 52 S.Ct. 458, 76 L.Ed. 946; Bandy v. United States, 8 Cir., 1961, 296 F.2d 882, 892, cert. den. 369 U.S. 831, 82 S.Ct. 849, 7 L.Ed.2d 796; and Bistram v. United States, 8 Cir., 1957, 248 F.2d 343, 347.

In view of the responsible and supervisory status which Dr. Stamm held with respect to the defendant on the two occasions he was at Springfield, of Dr. Stamm's exhaustive examination by the court and by the parties, of his conscientious and professional appraisal of the defendant, and of his acting as spokesman for the Springfield staff, we conclude that the district court's refusal to subpoena Dr. Settle and Dr. Sturgell as additional witnesses at government expense did not constitute an abuse of discretion.

3. *Questions asked of the psychiatrist witnesses.*

■ This has to do with the trial court's propoundment of questions to Dr. Stamm, an expert appointed by the court under Rule 28, F.R.Cr.P., and with the government's pursual of a similar inquiry through hypothetical questions to its rebuttal expert, Dr. Stark. The court's questions to Dr. Stamm were directed (a) to the defendant's mental capacity and reason on July 11, 1960, "to distinguish between right and wrong in connection with the doing of a criminal act", (b) to his mental capacity and reason on that date "to understand the nature and character of a criminal act and its consequence" and (c) to whether, if the defendant committed a criminal

act on that date, "it would have been occasioned by an uncontrollable or irresistible impulse". The objections were that these questions called for opinions "as to ultimate facts to be decided by the jury", that they invaded the province of the jury and violated the Sixth Amendment, and that they called for conclusions on matters outside the doctor's qualifications. The government's hypothetical questions to Dr. Stark were similarly directed and encountered like objections. All these objections were overruled.

Both physicians testified, in response to these questions, that the defendant on July 11, 1960, was able to distinguish between right and wrong, that he then understood the nature of a criminal act and its consequence, and that if he committed a criminal act on that date it was not occasioned by an uncontrollable or irresistible impulse.

■ This court has long held generally that an expert, as distinguished from a lay witness, may express his opinion on the ultimate jury question. Svenson v. Mutual Life Ins. Co. of New York, 8 Cir., 1937, 87 F.2d 441, 445, and cases cited; Mutual Benefit Health & Accident Ass'n v. Francis, 8 Cir., 1945, 148 F.2d 590, 594; Een v. Consolidated Freightways, 8 Cir., 1955, 220 F.2d 82, 87, and cases cited. See Transportation Line v. Hope, 1877, 95 U.S. 297, 298, 24 L.Ed. 477, and Holloway v. United States, 1945, 80 U.S.App.D.C. 3, 148 F.2d 665, cert. den. 334 U.S. 852, 68 S.Ct. 1507, 92 L.Ed. 1774.

The defense cites the District of Columbia cases of Carter v. United States, 1957, 102 U.S.App.D.C. 227, 252 F.2d 608, 617, and Fielding v. United States, 1957, 102 U.S.App.D.C. 167, 251 F.2d 878, 881, and argues that the testimony of the physicians should concern something more than mere expressions of conclusion and that the underlying material from which an opinion is fashioned, its supportive reasoning and,

where mental illness is at issue, its origin, development, and effect, are all necessary. We think, however, that the defense's very suggestion of this point leads to its resolution. There was extensive cross-examination of Dr. Stamm by both parties and of Dr. Stark by the defendant and, as to each witness, this brought out in detail the basis for any conclusion he expressed.

■ Of course it is the jury, and not the court or the expert witness, which must decide the ultimate issue of insanity here. And the jury was free to reject the testimony of both or of either of these experts. Dusky v. United States, supra, p. 757 of 295 F.2d; United States v. Cain, 7 Cir., 1962, 298 F.2d 934; 7 Wigmore, Evidence (3rd Edition 1940), § 1920, p. 18. Compare Blocker v. United States, 1961, 110 U.S.App.D.C. 41, 288 F.2d 853, 862–864 (concurring opinion).

4. *Instructions as to the defense of insanity.*

■ The trial court's instructions to the jury with respect to the issue of the defendant's sanity at the time of the commission of the crime embraced the right and wrong test, which emerged from M'Naghten's Case, 1843, 10 Cl. & Fin. 200, 8 Eng.Rep. 718, *plus* the additional condition of absence of an uncontrollable or irresistible impulse. The refused instructions offered by the defense incorporated respectively (a) the Durham standard in the exact form suggested by the Court of Appeals for the District of Columbia in Durham v. United States, 1954, 94 U.S.App.D.C. 228, 214 F.2d 862, 875, 45 A.L.R.2d 1430; (b) the American Law Institute proposals contained in its Model Penal Code,[9] and (c) a charge, based on § 402(2) of that Code, which would require the jury to consider, in determining punishment and in favor of life imprisonment as distinguished from the death penalty, any im-

9. Tentative Draft No. 4, Proceedings of 32nd Annual Meeting of American Law Institute, May 18–21, 1955, appearing as

*Responsibility*, Journal of Criminal Law, Criminology and Police Science (1955), Vol. 46, No. 4, pp. 450–484.

pairment of the defendant's capacity because of mental disease or defect.[10]

The defense urges that this court should now promulgate "a modified rule of insanity". The government suggests that it is debatable if the issue of insanity is in the case at all and asserts that if it is, it is "grounded upon opinion evidence of the most equivocal nature". In view of the capital nature of this case, and in view of the "some proof" of insanity standard of Davis v. United States, 1895, 160 U.S. 469, 488, 16 S.Ct. 353, 40 L.Ed. 499, we are content to assume that the issue is present. Compare Dusky v. United States, supra, 295 F.2d 743, 755.

(a) So far as the proposed instruction based on the Durham rule is concerned, we need only observe that this court three times, in the last three and one-half years, has refused to follow the Durham case. Voss v. United States, 8 Cir., 1958, 259 F.2d 699, 702–703; Dusky v. United States, supra, 1959, 271 F.2d 385, 394, 401; Dusky v. United States, supra, 1961, 295 F.2d 743, 759. We adhere to that position and note, as we pass, that it has been said that "Every court which considered Durham has rejected it". Blocker v. United States, supra, concurring opinion, p. 866 of 288 F.2d and cases cited there in footnote 22.[11]

██ (b) We are not prepared, at this point of the law's development in the insanity area, to be unsympathetic with the trial court's refusal to give the lessened punishment instruction. We suspect, in any event, that any responsible jury, in determining whether a positive recommendation of the death penalty should be forthcoming under 18 U.S.C. § 1201(a), will take into consideration just such matters as the proposed instruction suggests. Compare United States v. Dressler, 7 Cir., 1940, 112 F.2d 972, 980. The trial court here in its own instructions pointed out the jury's duties with respect to a death penalty recommendation and said, "Your determination of that question should be based on a thorough, careful, calm and dispassionate consideration of all the evidence". It also told the jury that if the death penalty was not recommended "the Court may sentence the defendant for imprisonment for life or for any term of years". We therefore do not presume that the jury did not have in mind the factors which the proposed instruction emphasizes. The refusal so to instruct was not error.

██ (c) This leaves for consideration the propriety of the trial court's use of the right and wrong test of M'Naghten plus irresistible impulse and the court's alleged refusal to incorporate into its instructions all the features of the Model Penal Code's proposal. We need not at this late date review in detail the origin, history, application, and variations of M'Naghten. This has been done adequately and at length in many places. Examples of this are Durham v. United States, supra, pp. 869–874 of 214 F.2d, and United States v. Currens, 3 Cir., 1961, 290 F.2d 751, 763–767. We note, as we have before in Voss v. United States, supra, pp. 702–703 of 259 F.2d; Dusky v. United States, supra, p. 394 of 271 F.2d; and Dusky v. United States, supra, p. 753 of 295 F.2d, that the Supreme Court of the United States, thus far at least, has approved the use of the M'Naghten right and wrong test. Davis v. United States, supra, 1895, 160 U.S. 469, 488, 16 S.Ct. 353, 40 L.Ed. 499; Davis v. United States, 1897, 165 U.S. 373, 378, 17 S.Ct. 360, 41 L.Ed. 750; Hotema v. United States, 1902, 186 U.S. 413, 420–421, 22 S.Ct. 895, 46 L.Ed.

---

10. The proffered instruction on insanity which was based on the Model Penal Code embraces much of what was included in the instructions as given. The trial court itself observed this in its written ruling on the defense's requested instructions.

11. To that list may now be added at least Longoria v. State, 1961, Del., 168 A. 2d 695, 699–701, and Kwosek v. State, 1960, 8 Wis.2d 640, 100 N.W.2d 339, 342–343. But Maine Statutes, c. 149, § 38-A, as added by Laws 1961, c. 310, adopts in essence the Durham standard.

1225; and Matheson v. United States, 1913, 227 U.S. 540, 543, 33 S.Ct. 355, 57 L.Ed. 631. See Fisher v. United States, 1946, 328 U.S. 463, 467, 66 S.Ct. 1318, 90 L.Ed. 1382, and Leland v. Oregon, 1952, 343 U.S. 790, 800–801, 72 S.Ct. 1002, 96 L.Ed. 1302. Neither need we attempt to ascertain in what respects, if any, the Model Penal Code's proposal varies in substance from the instructions actually given by the trial court here, or to formulate a more acceptable variation of it as the Third Circuit has tried to do in United States v. Currens, supra, p. 774, footnote 32, of 290 F.2d.

This court's approach to this issue was set forth in the second Dusky, supra, 295 F.2d 743, decided since the present defendant's trial and conviction. We repeat what was said there, p. 759:

"We might add by way of addendum, * * * that we are fully aware of the controversy presently pending in the federal courts over the respective merits of M'Naghten and its irresistible impulse and other variations, and Durham and of other suggested definitions of insanity as a defense to crime. We are aware specifically not only of Durham itself and of our rejection of it in the first Dusky appeal and in Voss, supra, 259 F.2d 699, to which rejection we continue to adhere, but of the approximately 80 cases, after Durham and occasioned by it, which have come before the Court of Appeals of the District of Columbia. We are aware, too, of the extra-judicial expressions of two present members of the Supreme Court of the United States evincing dissatisfaction with M'Naghten and, therefore, of what this presages for M'Naghten's reception when and if that court undertakes to review it. The Durham Rule: A Meeting Ground for Lawyers and Psychiatrists, William O. Douglas, 1956, 41 Iowa Law Review 485; testimony of Mr. Justice Frankfurter before the Royal Commission on Capital Punishment, September 1953, p. 102. And we are also acquainted (a) with the earlier enlightening decisions of State v. Pike, 1870, 49 N.H. 399; State v. Jones, 1871, 50 N.H. 369, and Parsons v. State, 1887, 81 Ala. 577, 2 So. 854, and others; (b) with the Ninth Circuit's 1957 opinion in Sauer v. United States, 241 F.2d 640, 652, certiorari denied 354 U.S. 940, 77 S.Ct. 1405, 1 L.Ed.2d 1539, taking the position, that it is for the Supreme Court or the Congress to prescribe any departure from the established concept of criminal responsibility; and (c) with the very recent provocative and interesting opinions, majority, concurring and dissenting, of the Court of Appeals of the District of Columbia in Blocker v. United States, D.C.Cir., 1961, [110 U.S.App.D.C. 41,] 288 F.2d 853, 857, 873, (showing the breaking away from Durham of one-third of the membership of that court) and the majority and dissenting opinions of the Third Circuit in United States v. Currens, 3 Cir., 1961, 290 F.2d 751, 776, both decided since the first Dusky."

We also repeat now, by way of specific holding, what we went on to say in Dusky, p. 759:

" * * * (W)e would hesitate to reverse a case where the trial court had employed instructions on insanity which this court has heretofore approved and henceforth we would be loath, indeed, to reverse where, as here, the trial court has used instructions, whether based theoretically on a M'Naghten variation or on the test set forth in the Modern Penal Code proposed by the American Law Institute or on that form revised as suggested by the Third Circuit in Currens, or whether couched in still other language, *if* the charge appropriately embraces and requires positive findings as to 3 necessary elements, namely, the defendant's *cognition*, his *volition*, and his *capacity to control* his be-

havior. If those 3 elements—knowledge, will and choice—are emphasized in the court's charge as essential constituents of the defendant's legal sanity, we suspect that the exact wording of the charge and the actual name of the test are comparatively unimportant and may well be little more than an indulgence in semantics. We think this approach to be sound because it preserves and builds upon those elements of M'Naghten and of irresistible impulse which are acceptable in these days and yet modernizes them in terms which a jury can grasp and apply."

The present case is one where the trial court employed instructions on insanity which this court had theretofore approved in Voss and in the first Dusky. Furthermore, the court's instructions here met the standard of the second Dusky namely, the embracement and requirement of positive findings, as to three elements, the defendant's cognition, his volition, and his capacity to control his behavior. Knowledge, will, and choice are all emphasized in the court's charge as essential constituents of the defendant's legal sanity. We therefore hold, in line with what we said in the second Dusky, that the trial court's definition of insanity as given to the jury in this case is not improper.

5. *The Birmingham evidence.*

The defense prior to trial moved for the suppression and return of the cartridges and other items taken from the defendant's person and of the Nash, its contents, the gun and other things seized at Birmingham by government agents. The grounds asserted for these motions were primarily that no offense was committed in the presence of the officers who arrested the defendant without a warrant; that the arresting officers had no reasonable ground or probable cause to believe the defendant had committed or was committing a felony; that there was no probable cause to support an incidental search without a warrant; and that the search and the seizure of the property were in violation of the Fourth Amendment.

The trial court in advance of trial held a lengthy hearing on these motions, and on the further motion mentioned below in point 7. The court ruled before trial that the Birmingham property was the subject of a proper search and seizure conducted as an incident to the lawful arrest of the defendant. United States v. Feguer, 1961, N.D.Iowa, 192 F.Supp. 377.

The defense's challenge to the propriety of the trial court's ruling, and to the later admission of this evidence at the trial, raises questions as to when the arrest took place and as to its legality. The government concedes that if the arrest was illegal the motion to suppress should have been granted. Carroll v. United States, 1925, 267 U.S. 132, 156, 45 S.Ct. 280, 69 L.Ed. 543.

■ We have no difficulty in concluding that the arrest of the defendant took place when, on the early afternoon of July 20, the FBI agents stopped the Nash and forced the defendant at gunpoint to emerge and to be braced, searched and handcuffed. The fact the handcuffs were soon removed does not change this result. The government here does not really question this conclusion. It seems inevitable in view of the comments of the Supreme Court with respect to the somewhat similar situation in Henry v. United States, 1959, 361 U.S. 98, 103, 80 S.Ct. 168, 4 L.Ed.2d 134.

■ Arrests by FBI agents are governed by 18 U.S.C. § 3052:

" * * * agents of the Federal Bureau of Investigation of the Department of Justice may * * * make arrests without warrant for any offense against the United States committed in their presence, or for any felony cognizable under the laws of the United States if they have reasonable grounds to believe that the person to be arrested has committed or is committing such felony."

This standard of "reasonable grounds to believe" has been held to equate with the "probable cause" standard, as to warrants, of the Fourth Amendment. Henry v. United States, supra, p. 100 of 361 U.S., p. 169 of 80 S.Ct. See Draper v. United States, 1959, 358 U.S. 307, 310, 79 S.Ct. 329, 3 L.Ed.2d 327. The Supreme Court in the Henry case, pp. 101–103 of 361 U.S., pp. 170–171 of 80 S.Ct., provides, with appropriate citations, the outlines of the approach to this problem which it has developed over the years. Mere suspicion is not enough to support an arrest and search without a warrant and

> "Evidence required to establish guilt is not necessary. * * * On the other hand, good faith on the part of the arresting officers is not enough. Probable cause exists if the facts and circumstances known to the officer warrant a prudent man in believing that the offense has been committed. * * * It is important, we think, that this requirement be strictly enforced * * *. We turn then to the question whether prudent men in the shoes of these officers * * * would have seen enough to permit them to believe that petitioner was violating or had violated the law. * * * It is, therefore, necessary to determine whether at or before that time they had reasonable cause to believe that a crime had been committed. * * * an arrest is not justified by what the subsequent search discloses * * *".

It also said in Brinegar v. United States, 1949, 338 U.S. 160, 175–176, 69 S.Ct. 1302, 1310–1311, 93 L.Ed. 1879:

> "In dealing with probable cause, however, as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. * * *
>
> "* * * Probable cause exists where 'the facts and circumstances within their [the officers'] knowledge and of which they have reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed. * * *
>
> "These long-prevailing standards seek to safeguard citizens from rash and unreasonable interferences with privacy and from unfounded charges of crime. They also seek to give fair leeway for enforcing the law in the community's protection. Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part. But. the mistakes must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability. The rule of probable cause· is a practical, nontechnical conception affording the best compromise that has been found for accommodating these often opposing interests. Requiring more would unduly hamper law enforcement. To allow less would be to leave law-abiding citizens at. the mercy of the· officers' whim or caprice." (footnotes omitted)

And a recent comment of the Court of· Appeals for the District of Columbia in Jackson v. United States, D.C.Cir., 1962,. 302 F.2d 194, is worthy of note:

> "We have indicated on many occasions that there are few absolutes in the area of the law dealing with what constitutes probable cause for arrest. We have also emphasized from time to time that probable cause is not to be evaluated from a remote vantage point of a library, but rather from the viewpoint of a prudent and cautious police officer on the scene at the time of arrest. The question to be answered is whether such an officer in the particular circumstances, conditioned by his observations and information, and guided by the whole of his police

experience, reasonably could have believed that a crime had been committed by the person to be arrested."

We apply these principles here.

 The events, described in detail above, which had taken place prior to the arrest show that:

(a) The Birmingham FBI office had received seemingly reliable information, initially from one used car dealer and then from others, that the man driving the Nash, or his passenger, who had called at their establishments might be Smith Gerald Hudson.

(b) This information from the first dealer was based on a picture of Hudson he had seen in a recent Birmingham newspaper. The others rested their conclusions upon a picture of Hudson displayed to them by the investigating agent.

(c) Hudson was then known to the FBI and to its Birmingham office as a man convicted of murder and of interstate transportation of a stolen automobile. He was wanted on a federal charge for flight to avoid imprisonment for that murder. He was among the ten "most wanted" persons. A federal warrant for his arrest had been outstanding for over three years. He was regarded in the Bureau as dangerous. The FBI had the duty to arrest him.

(d) The federal agents at Birmingham upon the foregoing information believed that this dangerous fugitive might then be in the area.

(e) The man in the Nash was asking to trade down the automobile at a less-than-normal price and thereby to obtain cash. The several dealers, in spite of the attractiveness of the deal, had declined it.

(f) The Nash bore plates of a distant state which required a certificate of title. This man had no such certificate. He had explained its absence on the excuse that with it the car would be available for theft.

(g) The man, after visiting several used car dealers, also called at an auto-mobile junk yard and had just driven into the parking area of another yard.

(h) One of the arresting officers, who had had Michigan experience, recognized the Michigan license on the Nash as one of a type issued only to a municipality in that state.

(i) The man was in an automobile and capable of taking off at any time.

The foregoing facts were all known to the arresting officers prior to the arrest. These were not facts disclosed by any search incidental or subsequent to the arrest. Would these facts permit "prudent men in the shoes of these officers" to believe that the man in the Nash was "violating or had violated the law?" Would these facts provide the arresting officers with "reasonable cause to believe that a crime had been committed?"

We think that they would. We also think that, particularly in view of Hudson's history and that convict's suspected presence in Birmingham on that day, the arresting officers might well have been derelict in their duty had they not stopped the defendant in his peddling rounds. This was not an arrest based on unfounded rumor or mere suspicion. This was an arrest made on the valid concern and apprehension of responsible citizens and businessmen of the community who themselves had reasonable grounds to be suspicious of so attractive an automobile trade, on the presence of an out-of-state car offered for sale cheap and without supporting evidence of ownership, on the wandering of such a car from dealer to dealer to junk yard, on the presence on that car of plates issued to a municipality of a foreign state, and on the valid though erroneous conclusion that Smith Gerald Hudson was at last at hand.

The fact that there was a mistaken identity in that Hudson turned out to be Feguer does not render the arrest illegal. A person may even be innocent of a crime for which he is charged and yet this of itself does not make his arrest illegal. One might assume the different and opposing situation of an arrest, made on reasonable grounds, of a man thought to be a certain smalltime offender but who

turned out on detailed investigation to be a Smith Gerald Hudson, an escaped and wanted murderer; it would be a sad commentary if that mistaken identity rendered the arrest illegal and compelled the release of Hudson.

Law enforcement is serious business. Of course, police operations must ever be subject to vigorous scrutiny and it is imperative that they be kept within constitutional limitations. But law enforcement is not a game. It would become a game, played with arbitrary rules, if this defendant's mistaken—and, we might also observe, falsified—identity were to nullify his arrest.

We therefore hold that the arresting agents had reasonable ground to believe that the man they were apprehending was Hudson; that, although by examining his fingerprints at the scene they promptly ascertained that he was not Hudson, they also had reasonable ground to believe that the man was in violation of the Dyer Act; that reasonably prudent men could not have acted differently than did the arresting agents at the time; and that the arrest was legal.

The items seized at the time of the arrest were the pistol, the cartridges, and the physician's bag. These were clearly taken in a search properly incidental to the lawful arrest. Draper v. United States, supra, p. 314 of 358 U.S., p. 333 of 79 S.Ct.; Agnello v. United States, 1925, 269 U.S. 20, 30, 46 S.Ct. 4, 70 L.Ed. 145; Harris v. United States, 1947, 331 U.S. 145, 154, 67 S.Ct. 1098, 91 L.Ed. 1399. The remaining items, taken from the automobile only after the defendant had admitted that it was stolen, of course were lawfully seized.

6. *The Dubuque evidence.*

█ The defense during the trial [12] moved to suppress eight tendered government exhibits (the Dubuque rent receipt, the Howes identification, the Quality Cleaners slip, the Dubuque Laundry slip, the Milwaukee bank envelope, the bus ticket, the Wisconsin Employment Service card, and the one horseshoe die)

which had been found and seized by the Dubuque police (and later turned over to the FBI) when, with the landlord's permission but without a warrant, they searched the room at 1004 Bluff Street on the night of July 12, 1960. This motion to suppress similarly rests on claims of unreasonable search and seizure under the Fourth Amendment. The trial court denied the motion on the ground that at the time of the search the defendant had left Dubuque with intent not to return and thus had abandoned the room.

The defense position is that these exhibits were seized on mere suspicion. It points out that the defendant had paid the room rent for a period not ending until July 14; that the lights were on when the room was entered; that the examining officers had no reason then to believe that the defendant was not still occupying the room or that his absence was more than temporary; and that the only real information they possessed was that the defendant had rented that room five days before. At the oral argument on appeal the defense conceded that the defendant had abandoned the room when he left Dubuque the night of July 11 but it stressed that this was not known by the Dubuque police or by anyone else at the time of the search on July 12. The defense suggests that a search which is illegal is not made justifiable by what the search discloses and that the question of legality is to be determined only by the circumstances which exist at the time of the search.

The government position is that the record is conclusive that the defendant had abandoned the room on July 11; that the search was made after that abandonment; that the police went into the room in connection with their search for Dr. Bartels who by then had been reported missing; that this was done on reliable information that the doctor had been seen entering the building with the defendant who had rented the room; and that it was with the permission of the landlord. The government points out that the several exhibit items were scattered about

---

12. No question of timeliness under Rule 41(e), F.R.Cr.P., is present.

the room and that the Howes identification was in the waste basket.

The Fourth Amendment safeguard against unreasonable searches and seizures is directed to the "right of the people to be secure in their * * * houses, * * * ". This clearly has reference to a place of occupancy. It has not been restricted to a permanent home but has been held applicable to a hotel room, Johnson v. United States, 1948, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436, and to a rented room, McDonald v. United States, 1948, 335 U.S. 451, 69 S.Ct. 191, 93 L.Ed. 153, and irrespective of the fact that occupancy is only a few days on a transient basis. Eng Fung Jem v. United States, 9 Cir., 1960, 281 F.2d 803, 805. It has also been applied to afford protection to a person who, although not the occupant, is in an apartment with the latter's permission, Jones v. United States, 1960, 362 U.S. 257, 267, 80 S.Ct. 725, 4 L.Ed.2d 697, and to one who, with the consent of the occupant of a hotel room, was permitted access to the room but, without the occupant's knowledge, had placed contraband property there. United States v. Jeffers, 1951, 342 U.S. 48, 52, 72 S.Ct. 93, 96 L.Ed. 59.

These cases, however, are concerned with occupied and not vacated premises. In the case before us the evidence is uncontroverted that the items were seized only after the defendant had returned to the room, had gathered his desired belongings and had departed never to return. This departure effected a discard and abandonment of those items. The present situation, it seems to us, is governed by Abel v. United States, 1960, 362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668. There, the defendant checked out of his hotel room, albeit with encouragement from arresting officers. After he had done so, but prior to the checkout hour, an FBI agent, with the consent of the hotel management, searched the room without a warrant and seized articles left in a waste basket. The court said, p. 241, 80 S.Ct. p. 698:

"* * * it was entirely lawful, although undertaken without a warrant. This is so for the reason that at the time of the search petitioner had vacated the room. The hotel then had the exclusive right to its possession, and the hotel management freely gave its consent that the search be made. Nor was it unlawful to seize the entire contents of the wastepaper basket, even though some of its contents had no connection with crime. So far as the record shows, petitioner had abandoned these articles. He had thrown them away. So far as he was concerned, they were *bona vacantia*. There can be nothing unlawful in the Government's appropriation of such abandoned property. * * * "

See also Hester v. United States, 1924, 265 U.S. 57, 58, 44 S.Ct. 445, 68 L.Ed. 898, and Newingham v. United States, 3 Cir., 1925, 4 F.2d 490, 493, cert. den. 268 U.S. 703, 45 S.Ct. 638, 69 L.Ed. 1166. Abandonment is not to be foreclosed here until the paid rent period ran out any more than, in the Abel case, it was not foreclosed until the checkout hour had arrived. It follows that the search and seizure here, although without a warrant, were not illegal and that the evidence in question is not inadmissible on the constitutional grounds asserted.

The defense submits that recent Supreme Court cases show increasing concern for enforcement of the Fourth Amendment. Cited are Chapman v. United States, 1961, 365 U.S. 610, 81 S.Ct. 776, 5 L.Ed.2d 828 (involving entry with the consent of the landlord); Elkins v. United States, 1960, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669; Rios v. United States, 1960, 364 U.S. 253, 80 S.Ct. 1431, 4 L.Ed.2d 1688; United States v. Di Re, 1948, 332 U.S. 581, 68 S.Ct. 222, 92 L.Ed. 210, and Mapp v. Ohio, 1961, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081. These cases may well be said to demonstrate the continuing concern of our highest court for the preservation of Fourth Amendment rights. None of them, however, concerns the search of abandoned premises. We regard them as distinguishable on their facts.

The defense's suggestion that the search of July 12 was unreasonable because the abandonment of the room by the defendant was not then known to the Dubuque police is somewhat intriguing but is, we feel, without substance. Abandonment in fact had been effected before the search. It was purposeful and voluntary and the room's search could not possibly have violated any constitutional right of the defendant.

### 7. *The statements of the defendant.*

The defense also filed a motion to suppress all written and oral statements or purported admissions or confessions of the defendant taken from July 20 through July 25, 1960, while he was in Birmingham custody. The grounds asserted were (a) that these were made after the defendant's arrest and without promptly taking him before a proper magistrate, in violation of Rule 5(a), F.R.Cr.P., and of the Fifth Amendment; (b) that they were involuntarily made; (c) that they were made after an illegal arrest; and (d) that they were obtained while the defendant was under coercion and duress, held incommunicado, suffering from mental illness, deprived of his right to counsel, and after promises of immunity, all in violation of the Fifth Amendment.

This motion was heard by the trial court at the same time the motions discussed in point 5 were heard. The court at that time treated the motion as one directed only to statements made before the hearing on July 21. The court ruled, 192 F.Supp. 377, 388–389, that under Mallory v. United States, 1957, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479, and McNabb v. United States, 1943, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819, any statements made by the defendant between 5:00 p. m. on July 20 and the preliminary examination on the forenoon of July 21, were not admissible but that any statements made by the defendant from the time of his arrest shortly prior to 2:00 p. m. on July 20 and up to 5:00 p. m. on that day were admissible. Later, by separate order, the court found that the statements made by the defendant after July 21 were not due to those made on July 20 after 5:00 p. m. and would have been made even though he had not made those July 20 statements.

At the trial, after additional testimony was taken outside the presence of the jury, the defense also asserted as grounds for its motion to suppress (a) that the defendant was deprived of the assistance of counsel in the jail interviews after the hearing, in violation of the Sixth Amendment and of Rule 44, F.R.Cr.P., (b) that the post-hearing statements were obtained after the appointment of Alabama counsel for the defense but without knowledge or consent of that counsel or of the court, and (c) that these statements were inadmissible because they were "fruit of the poisonous tree". The prosecution did not attempt to introduce at the trial the oral and written statements taken from the defendant on the night of July 20 after 5:00 p. m., or any statement taken on July 22.

The challenged statements thus really come down to two: The first consists of the oral and written statement made by the defendant on the afternoon of July 20 about 3:30 p. m. admitting his real name and that the Nash had been stolen. This was before Birmingham was advised by Detroit that the defendant was wanted in Iowa for kidnapping and before contact with Iowa was made. The second is the oral statement made to Agents Dawson and Brown at the jail interview on July 23. This statement apparently is generally consistent with the written statement, suppressed by the trial court, taken by other agents the night of July 20 and with the statement made by the defendant on July 22.

The statement of the afternoon of July 20 was made as the facts were gradually coming to light. The statement itself is not entirely accurate and certainly is not complete, but it does reveal the defendant's luring of Dr. Bartels from his home and the theft of the Nash. It fabricates the manner of his acquiring the car. It came forth as the officers were attempting to verify, one by one and step by step,

the statements the defendant was making. Their first endeavor was to check the defendant's claimed identity as William Lloyd Howes and the automobile's Michigan registration which he so positively claimed was in his name. This was done with all possible dispatch. As soon as the stolen character of the plates was thereby ascertained, the defendant's admission of his true name and of the theft of the car was forthcoming. The record clearly shows, as to all this, fully voluntary action on his part. The Mallory case, usually strongly urged by the defense in situations of this kind, itself proclaims, p. 455 of 354 U.S., p. 1360 of 77 S.Ct., that the requirement of Rule 5(a) that appearance before the examining magistrate be effected "without unnecessary delay" does not mean that there shall be "mechanical or automatic obedience" and that circumstances may justify a brief delay between arrest and commitment as, for instance, "where the story volunteered by the accused is susceptible of quick verification through third parties". This was the situation here. Quick verification was possible and it was effected. Had the call to Detroit revealed that the plates had been properly issued to the defendant as he claimed, his statements would have checked out and there would have been no need to hold him further for formal examination. We conclude, therefore, that the defendant's detention up to 5:00 p. m. without being taken before a magistrate was entirely proper, that the statements he made during that period were not given under conditions violative of the Mallory standard, and that their admission in evidence by the trial court was not error.

▆▆▆ The oral statement of July 23 might be said to present a more involved problem but we easily conclude that it, too, meets the standards of admissibility. The involvement, if any, lies in the existence of similar but suppressed statements taken on the night of July 20 and the oral but unoffered statement of July 22 and in what the defense suggests is the dependence and necessary emergence of the July 23 statement from the former.

Technically, of course, the statements made after the morning of July 21 fall outside the McNabb rule for they were all given after examination under Rule 5 and therefore were not uttered during improper detention. The question thus is really one of basic voluntariness. The procedure prescribed by United States v. Carignan, 1951, 342 U.S. 36, 38, 72 S.Ct. 97, 96 L.Ed. 48, namely, an independent hearing in the absence of the jury as to the voluntary or involuntary character of the statement, was meticulously followed.

Because a subsequent statement happens to be the same as a prior one suppressed under the McNabb rule, does not necessarily mean the second is the wrongful fruit of the original. It is a relationship of dependency between the two which creates the "fruit of the poisonous tree" result. United States v. Bayer, 1947, 331 U.S. 532, 67 S.Ct. 1394, 91 L.Ed. 1654.

The trial court in its instructions to the jury with respect to each of the challenged statements carefully pointed out that the prosecution was required to establish beyond a reasonable doubt that the defendant made the statement, that he made it voluntarily, and that he made it without inducement, coercion, or promise of immunity or leniency, and, with respect to the written statement, that he signed it with knowledge and understanding of its contents; that if the government did not establish all this, the statement was to be totally disregarded; and that if the requisites were established the jury could give the statement such weight as it felt it was justly entitled to. We feel that these instructions were proper, that they were amply justified by the record and that upon the record the jury might properly conclude, as it must have done, that the statements in question were voluntarily given and that they met all the requisites described by the trial court.

After careful consideration of the complete record and of the principles enunciated by McNabb v. United States, supra; United States v. Mitchell, 1944, 322 U.S.

65, 64 S.Ct. 896, 88 L.Ed. 1140; Lyons v. Oklahoma, 1944, 322 U.S. 596, 64 S.Ct. 1208, 88 L.Ed. 1481; United States v. Bayer, supra; Upshaw v. United States, 1948, 335 U.S. 410, 69 S.Ct. 170, 93 L.Ed. 100, and United States v. Carignan, supra, we conclude that this case on the issue of voluntariness falls within the factual and legal scope of Carignan, Mitchell and Bayer and not within that of McNabb and Upshaw. See and compare Goldsmith v. United States, 1960, 107 U.S.App.D.C. 305, 277 F.2d 335, 340–342, cert. den. sub. nom. Carter v. United States, 364 U.S. 863, 81 S.Ct. 106, 5 L.Ed. 2d 86; McNabb v. United States, 6 Cir., 1944, 142 F.2d 904, 908–909, cert. den. 323 U.S. 771, 65 S.Ct. 114, 89 L.Ed. 616; Jackson v. United States, 1960, 109 U.S. App.D.C. 233, 285 F.2d 675, 679–680, cert. den. 366 U.S. 941, 81 S.Ct. 1666, 6 L.Ed.2d 852; United States v. Vita, 2 Cir., 1961, 294 F.2d 524, 531–534.

Spano v. New York, 1959, 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265, and Powell v. Alabama, 1932, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158, cited by the defense, have to do with statements which were clearly involuntary and, we feel, are easily distinguishable on their facts from the case before us.

 Finally, we note that the Sixth Amendment affords no comfort for the defense. That Amendment's requirement that in all criminal prosecutions an accused shall "have the Assistance of Counsel for his defence" has been said to apply only after a defendant is formally charged by indictment or information. Counselman v. Hitchcock, 1892, 142 U.S. 547, 563, 12 S.Ct. 195, 35 L.Ed. 1110; Gilmore v. United States, 10 Cir., 1942, 129 F.2d 199, 203, cert. den. 317 U.S. 631, 63 S.Ct. 55, 87 L.Ed. 509. See State of Utah v. Sullivan, 10 Cir., 1955, 227 F.2d

511, 513, cert. den. Braasch v. Utah, 350 U.S. 973, 76 S.Ct. 449, 100 L.Ed. 844, and Ruben v. Welch, 4 Cir., 1947, 159 F.2d 493, cert. den. 331 U.S. 814, 67 S.Ct. 1199, 91 L.Ed. 1833. Compare People v. Di Biasi, 1960, 7 N.Y.2d 544, 200 N.Y.S. 2d 21, 166 N.E.2d 825. The statements in question here were all forthcoming before the indictment was returned on August 9, 1960. Furthermore, Birmingham counsel had been appointed on July 21 in the persons of Mr. Black and then Mr. Mitch. Although an attorney would perhaps not have presumed to confer with the defendant after the July 21 hearing without notice to defense counsel, this restraint rests on considerations of professional ethics. We know of no parallel legal rule of restraint imposed upon investigating officers where, as here, the requirement of voluntariness is clearly established. "The mere fact that a confession was made while in the custody of the police does not render it inadmissible". McNabb v. United States, supra, p. 346 of 318 U.S., p. 615 of 63 S.Ct.; United States v. Mitchell, supra, p. 69 of 322 U.S., p. 897 of 64 S.Ct.; United States v. Bayer, supra, pp. 540–541, of 331 U.S., pp. 1398–1399 of 67 S.Ct.; Hayes v. United States, 8 Cir., 1961, 296 F.2d 657, 668.

We therefore conclude that the refusal to suppress the challenged statements and their admission in evidence were not error.

8. *Proposed defense comments in the closing argument.*

 The suggestion here is that the defendant was deprived of a fair and impartial trial because counsel was twice asked by the court, after suggestion by the United States Attorney, to refrain from comment relative to opposition to and abolishment of the death penalty.[13]

---

13. "Mr. Kildee: * * * I hope you don't reach this point [the question of recommending the death penalty], but if you do, I sort of feel sorry for you because it will undoubtedly be one of the biggest decisions that you have ever had to make or perhaps will ever have to

make in the future, and that brings us to the question of capital punishment.

"Now, ladies and gentlemen, capital punishment is probably one of the most controversial issues in the United States. However, according to the 1958 Roper report, those opposed to the infliction of

Apart from these two interruptions, no restraint was placed upon the closing argument of the defense.

A search of the record reveals nothing having to do with the status, acceptance or abolishment of the death penalty in the several states. We agree with the trial court's observations that, by 18 U.S.C. § 1201(a), Congress in its wisdom has seen fit to provide for the death penalty if the kidnap victim has not been liberated unharmed and if the verdict of the jury shall so recommend, and that what the several states have done by way of fixing punishment for state crimes was not only not a part of this record, but was not a matter of concern for this jury in determining whether or not to recommend the death penalty for this defendant under this statute.

This court said, in Brennan v. United States, 8 Cir., 1957, 240 F.2d 253, 263, cert. den. 353 U.S. 931, 77 S.Ct. 718, 1 L.Ed.2d 723:

> "The argument of counsel, generally speaking, should be confined to the evidence that has been produced and to such inferences as may reasonably be drawn therefrom."

United States v. Spangelet, 2 Cir., 1958, 258 F.2d 338, 342–343; United States v. Pepe, 2 Cir., 1957, 247 F.2d 838, 844–845; United States v. Tucker, 3 Cir., 1959, 267 F.2d 212; Snipes v. United States, 6 Cir., 1956, 230 F.2d 165, and Graham v. United States, 6 Cir., 1958, 257 F.2d 724, 730, are examples of cases where extra-record closing comments by the prosecution were held to constitute

reversible error. But this requirement that closing comment be kept within the record and the inferences appropriately drawable therefrom applies to the defense as well. Laska v. United States, 10 Cir., 1936, 82 F.2d 672, 679–680, cert. den. 298 U.S. 689, 56 S.Ct. 957, 80 L.Ed. 1407; Holmes v. United States, 1948, 84 U.S.App.D.C. 168, 171 F.2d 1022, 1023–1024. We therefore find no error in the trial court's restraint of defense counsel as to the remarks in question or in the court's manner of so doing.

9. *Comments of the prosecution in the closing argument.*

Unfairness in the closing arguments of the prosecution is strongly urged upon us. The remarks consist, specifically, of comments made by the Assistant United States Attorney in the initial closing argument and of statements made by the United States Attorney in the government's final argument to which the defense had no opportunity for rebuttal. These comments are said to involve comparisons of this case with others, expressions of personal belief in the defendant's guilt and in the punishment to be given, invective and abuse, the holding up of defendant's mental illness to ridicule, and the deprival of rights guaranteed by the Fifth and Sixth Amendments.

We note, initially, that the defense made no complaint or objection in the trial court as to any of these comments. The defense therefore encounters the rule that in the absence of an objection to the closing argument of the prosecution in a criminal case there is

---

the death penalty were greater than those in favor.

"Mr. Van Alstine: That's outside the record.

"The Court: Pardon me, Judge Kildee, I believe you are getting outside the record.

"Mr. Kildee: All right, your Honor, I stand corrected.

\* \* \* \* \*

"Mr. Kildee: \* \* \* Now there is only one reasonable purpose for the death penalty and that is that it's a deterrent for crime, that is, that it will be an example to others and that they won't commit capital crimes.

"Well, has it worked? There are nine states out of the United States that have completely abolished the death penalty and—

"Mr. Van Alstine: If the Court please—

"The Court: I believe you are getting outside the record, Mr. Kildee. Under the federal law, that penalty is provided and the jury should decide that matter in a calm, dispassionate manner. What other states do or do not do is not a part of this record.

"Mr. Kildee: Again I stand corrected."

nothing for review here. Myres v. United States, 8 Cir., 1949, 174 F.2d 329, 339, cert. den. 338 U.S. 849, 70 S.Ct. 91, 94 L.Ed. 520; Kreinbring v. United States, 8 Cir., 1954, 216 F.2d 671, 673; Schmidt v. United States, 8 Cir., 1956, 237 F.2d 542, 543; Dusky v. United States, supra, 8 Cir., 1959, 271 F.2d 385, 401. See United States v. Socony-Vacuum Oil Co., 1940, 310 U.S. 150, 238–239, 60 S.Ct. 811, 84 L.Ed. 1129.

We are aware, of course, of Rule 52(b), F.R.Cr.P., and its provision that plain errors affecting substantial rights may be noticed on appeal even though they were not brought to the attention of the trial court. The defense has also cited Viereck v. United States, 1943, 318 U.S. 236, 248, 63 S.Ct. 561, 566, 87 L.Ed. 734, with its comment, that under the circumstances there, "We think that the trial judge should have stopped counsel's discourse without waiting for an objection", and Mr. Justice Sutherland's well-known words in Berger v. United States, 1935, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314.

 We have reviewed the closing arguments in their entirety and in detail and we conclude that the comments of government counsel were not inflammatory or improperly prejudicial. The arguments were confined to the record and to inferences which might reasonably flow from the record. There was no instance of misstatement of fact and no assertion of facts not in the record. There was no expression of either prosecutor's personal beliefs as to matters outside the record. And, of course, as this court, speaking through Judge Whittaker, later Mr. Justice Whittaker, said in Schmidt v. United States, supra, p. 543 ·of 237 F.2d:

"* * * it is not misconduct for a district attorney to express his personal belief in the guilt of a defendant, if such belief is expressly based, as it was here, on the evidence, and the jury is not led to believe that the district attorney is basing his belief upon evidence not in the record."

To the same effect are Thompson v. United States, 5 Cir., 1959, 272 F.2d 919, 921; Henderson v. United States, 6 Cir., 1955, 218 F.2d 14, 19, 50 A.L.R.2d 754, cert. den. 349 U.S. 920, 75 S.Ct. 660, 99 L.Ed. 1253, and cases cited; and United States v. Holt, 7 Cir., 1939, 108 F.2d 365, 370, cert. den. 309 U.S. 672, 60 S.Ct. 616, 84 L.Ed. 1018.

The Supreme Court has observed, with respect to a point of this kind that "each case necessarily turns on its own facts". United States v. Socony-Vacuum Oil Co., supra, p. 240 of 310 U.S., p. 852 of 60 S.Ct. The case before us is one concerning a brutal killing of an innocent victim. It was vigorously prosecuted and vigorously defended. In the closing arguments strong words were used by the prosecution. But in those closing arguments strong words were also used by the defense. As was said in Berger v. United States, supra, p. 88 of 295 U.S., p. 633 of 55 S.Ct., a government attorney "may prosecute with earnestness and vigor—indeed, he should do so" and there is a distinction between "hard blows" and "foul ones". We hold that the blows here were hard and not foul, were within the range of legitimate and appropriate comment upon the evidence, were not improperly prejudicial or inflammatory, did not in any way approximate the type of comment condemned in Viereck and Berger, were those of advocates and not persecutors, and did not deprive the defendant of any constitutional right. Compare Isaacs v. United States, 8 Cir., 1962, 301 F.2d 706.

This opinion should not be closed without an expression of appreciation to Paul L. Kildee, former assistant county attorney, county attorney and state district judge in Iowa, and to Frederick G. White, former assistant county attorney there, for their assistance, under court appointments, to the trial court and to us in their most capable representation of the defendant. We are conscious of the vast amount of time which they spent upon the substantial and difficult issues of this case. The public should be grateful for

this positive recognition of professional responsibility in an unpopular cause.

We deem it only right and proper, too, that we note a word of respect for the work of the able and experienced trial judge in this not easy-to-try case. The entire record of the trial and of the pre-trial matters demonstrates meticulous care for correctness of procedure; for the assurance of proper and adequate protection for the defendant; and, as best we can tell from the cold record, for the preservation of a trial atmosphere of that decorum, impartiality, and control which is necessary and conducive to the proper administration of criminal justice.

Affirmed.