**Albert Eugene BEALE, Petitioner,**

v.

**UNITED STATES of America, Respondent.**

**No. WC 6745.**

United States District Court, N. D. Mississippi, W. D.

Oct. 8, 1970.

Peggy A. Jones, Ashland, Miss., for petitioner.

Alfred E. Moreton, III, Asst. U. S. Atty., Oxford, Miss., for respondent.

## MEMORANDUM OPINION

KEADY, Chief Judge.

In this proceeding Albert Eugene Beale, petitioner, seeks to set aside two consecutive federal sentences pursuant to 28 U.S.C. § 2255. The first sentence, imposed January 14, 1963, for a prison term of 15 years, was for petitioner's conviction by jury November 26, 1962, on 12 counts of violation of 18 U.S.C. § 1503 (unlawfully, knowingly and corruptly endeavoring to influence and

impede petit jurors). This conviction was affirmed by the United States Court of Appeals for the Fifth Circuit, No. 20295, 327 F.2d 227 (5 Cir.1964). The second sentence, imposed June 28, 1963, was for a prison term of two years, to be consecutive to the first mentioned sentence. The second sentence was for petitioner's conviction by jury May 13, 1963, on a charge of having possession of 88 gallons of nontax-paid whiskey in violation of 26 U.S.C. § 5604(a) (1). No question of petitioner's mental competency was raised at either trial, and thus no hearing was conducted to determine his competency.

On November 1, 1967, petitioner filed an original motion, pro se, raising for the first time the issue of his mental capacity at time of the trials, convictions, and sentencing. Later, counsel retained by petitioner's family entered the case and have since managed the proceedings on his behalf.

After sentencing, petitioner began serving his sentences in the Atlanta federal penitentiary, which service was without incident until March 1966. At that time Dr. Susan Homans, prison psychiatrist, noted what was thought to be irrational demeanor manifested by unreal and grandiose expressions and aggressive and hostile ideas. This specialist opined that petitioner was grossly psychotic with paranoid delusions, "a paranoid schizophrenic [who] may have been psychotic for a considerable length of time." On April 13, 1966, the prison's psychiatric staff considered petitioner's case, concurred in Dr. Homan's opinion, and determined that petitioner was in need of extensive psychiatric hos-. pitalization and treatment. On May 6, 1966, he was received at the Medical Center at Springfield, Missouri, by transfer from the Atlanta Penitentiary, and placed in a psychiatric ward, where he still remains under treatment.

At the Medical Center, petitioner first came under the care of Dr. Buschman, staff psychiatrist, who treated him until June 1967. From interviews and studies of petitioner, this specialist made a diagnosis of "schizophrenic reaction, paranoid type, acute." Petitioner was noted to be hostile but denying delusions or hallucinations, although he consistently expressed grandiose ideas, such as claiming ownership to the whole State of Mississippi, ownership of the penitentiary and all of the fixtures in it; and he was noted as not sleeping, laughing a great deal and talking. to himself. On October 20, 1966, petitioner was interviewed by a board of staff psychiatrists, Drs. Buschman, Moreau and Kinzel, at which time, according to records, he manifested a markedly increased pressure of speech, grandiose delusions and denial of previous psychosis. These staff members unanimously concurred in Dr. Buschman's previous diagnosis, deeming "there is probable cause to believe that Mr. Beale was mentally incompetent at the time of his initial trial." After ascertaining that the issue of petitioner's mental competency had not been raised and determined at trial, the staff recommended its report be forwarded to the Bureau of Prisons for possible action under 18 U.S.C. § 4245.

On December 4, 1967, petitioner's case was reviewed again by staff psychiatrists, Drs. Moreau, Guschwan and Glotfelty, who found that he remained "mentally incompetent for trial and certifiable." Petitioner's request for transfer to Atlanta for doing legal work was denied. This staff report noted that "since the time of confinement began soon after the patient's trial, in all probability his mental condition remained the same at that time as at the time of his trial." These specialists noted that records from Federal Correctional Institution at Texarkana, Texas, in June, 1959, where petitioner had served a prior federal sentence, indicated strange behavior with petitioner remarking he was going to kill someone, and exhibiting such hostility that the other inmates were afraid of him. However, his psychiatric evaluation at that institution was without apparent psychosis.

Also, the Springfield psychiatrists made inquiry in July 1966 of Honorable James P. Coleman, now a member of the United States Court of Appeals for the Fifth Circuit, who had, prior to his ascending the bench, represented petitioner in the charges involving the liquor tax violation. Judge Coleman advised the doctors that on the basis of his contacts with petitioner at the time he was "very much under the impression that he suffered from some kind of mental illness; he acted rather unusual when he came to my office in many particulars. He did not seem to be too much in touch with reality when I told him in the United States Courthouse at Oxford that because of his jury activities, it would be impossible for me to represent him any longer."

In February 1967 the Bureau of Prisons concluded that, notwithstanding the unanimous opinion of the psychiatric staff at Springfield Medical Center that petitioner was mentally incompetent at the time of his initial trial, there was insufficient information relating to his condition at time of trial to justify issuance of a certificate under § 4245. Nine months later, petitioner, as an inmate of the Springfield Medical Center, began the instant proceeding.

Evidentiary hearings were conducted in March and October, 1969, at which principally lay witnesses were offered. Because of the absence of up-to-date testimony from examining psychiatrists, Drs. Buschman, Moreau, Kinsel, Guschwan and Glotfelty, the court directed that the parties procure their testimony by deposition and supplement the record accordingly. Transcripts of evidence were prepared and furnished to these specialists whose testimony has been secured after some delays. The parties have now submitted memorandum briefs and the matter is, somewhat belatedly, now before the court for final decision.

At the evidentiary hearing, petitioner's mother and brother testified that petitioner, when he was about 10 years old, had been struck by lightning which burned his head and body and rendered him unconscious, resulting in a hospital stay for ten days; that petitioner had "peculiar ways" and "moody spells"; that petitioner would drive a truck around in circles, shoot his pistol out on the lawn, stand in the middle of the road counting money where he would be laughing and would cause cars to move around him; and that petitioner had big ideas about money, claiming that while he was in jail he was winning thousands of dollars by betting on horse races. These witnesses mentioned instances of irrational conduct before and after his release from Texarkana federal prison.

At the time of his court trials in question, petitioner was 32 years of age, unmarried and had lived most of his life on a farm near Byhalia, Mississippi. He had a 12th grade education and had served two years in the United States Army (January 17, 1951 to March 9, 1953), where he was convicted by courts-martial on two occasions for being AWOL, being disrepectful to an officer and failing to be at his appointed place of duty.

Petitioner offered the deposition of Judge Coleman, who recalled his contacts with petitioner in April and May 1962 when he was defense counsel in the whiskey violation case, which was due to come to trial on May 17, 1962. When Coleman appeared in court on that date he was notified by the presiding judge, the late Judge Claude F. Clayton, that according to reports, petitioner had made improper contact with one or more jurors in attendance, which necessitated a continuance of the case. Judge Coleman then withdrew as defense counsel but noted that petitioner expressed no concern about the gravity of the accusation that he had tampered with the jury nor regret that Coleman was withdrawing as counsel. Upon reflection, Judge Coleman deemed petitioner's behavior to be "really a very bizarre thing" and that as counsel in the case he should have re-

quested the court for a competency examination and hearing.

The government offered H. M. Ray, United States Attorney, and H. H. McKnight as its principal lay witnesses. Mr. Ray, who was in charge of both prosecutions, recalled that petitioner, prior to the date of trial on the whiskey charge, had personally requested from him the jury list which Ray refused, and told petitioner he should consult his lawyer, Mr. Coleman, about such matters. Mr. Ray later observed the petitioner in court, conferring with his new counsel, Mr. McKnight, throughout the trial of the jury tampering charge, and he recalled no unusual events concerning petitioner "except I believe he was a difficult man for his lawyer to represent,—as hardheaded." Detecting nothing at the time to cause the government to move for a mental examination, the United States Attorney was of the view that at least at the time of the trial for jury tampering petitioner had mental capacity to understand the charges against him, but he acknowledged that petitioner's behavior regarding a request for the jury list was "brazen enough". Mr. McKnight testified that on the basis of his interviews and contacts with petitioner for a period of three weeks prior to November 26, 1962, and association at the trial, petitioner, in his opinion, *had* mental capacity sufficient to understand the charges, confer with counsel and assist in his defense. However, McKnight stated that instead of assisting him, petitioner hindered the defense, recalling that petitioner "kept bothering me all during the trial, punching me on the back", which conduct drew a reprimand from the presiding judge, that petitioner was disruptively loud in the jury's presence, argued law on cross-examination with the United States Attorney and acted very aggressively throughout the trial. Mr. McKnight also testified that contrary to his advice, petitioner insisted on testifying. According to the trial record, petitioner actually took the stand to deny knowing or contacting any of the persons who had been on the panel in question, despite the fact that 15 individuals summoned as jurors had each earlier testified to a personal visit from petitioner, who was a stranger to all of them, and who had requested them to help him on his trial for whiskey violation. After petitioner's conviction McKnight continued to represent him on appeal but apparently entertained no thought that a mental examination for petitioner was called for. Other counsel represented petitioner at the May 13, 1963, trial of the whiskey violation. There is little evidence regarding what occurred at that trial, at which petitioner did not testify as a witness.

The trial records of both prosecutions were placed in evidence by the government and made available, along with testimony of lay witnesses in the instant proceeding, to the five psychiatrists whose testimony was taken at the final stage of the hearing.

Drs. Guschwan, Kinzel and Moreau have testified that petitioner lacked mental competency to undergo trial in 1962 and 1963. On the other hand, Dr. Glotfelty maintained that petitioner was then mentally competent; and Dr. Buschman was of the view that petitioner was probably competent, stating that his opinion was not based on reasonable medical certainty.

Dr. H. B. Fain, another Springfield psychiatrist having familiarity with petitioner since 1968, shared the opinion that petitioner was probably competent at the time of his trials, but he affirmed that petitioner unquestionably had suffered a "psychotic break" at some undetermined earlier time in his life which resulted in mental incompetency.

■ We agree with the government that the petitioner is not entitled to the statutory presumption of mental incompetency, as provided by 18 U.S.C. §

4245,[1] for the reason that petitioner was neither examined by a board of examiners constituted under § 4241 [2] nor certified by the Director of the Bureau of Prisons as mentally incompetent at time of trial. Even if we disregard the fact that the instant proceeding is brought under § 2255 and not § 4245, the evidence shows only that petitioner was found to be mentally incompetent by staff psychiatrists at the Springfield Medical Center. There is no claim that the *statutory board of examiners* provided for in § 4241, as distinguished from staff doctors of the Medical Center, made an examination of petitioner. Wheeler v. United States, 304 F.Supp. 575, 576 (E.D.Mo.1969); Burrow v. United States, 301 F.2d 442, 443 (8 Cir. 1962); United States v. Mancuso, 152 F.Supp. 355, 359 (W.D.La.1957). Thus there is no substance to petitioner's claim that the failure of the Director of the Bureau of Prisons to issue a certificate of mental incompetency amounted to legal error and did not comply with the statutory requirement. Stone v. United States, 358 F.2d 503 (9 Cir.1966), does not support petitioner's position because defendant in that case was, in addition to being found grossly psychotic by Springfield Medical Center psychiatrists, duly certified as being of unsound mind by a statutory board of examiners at McNeil Island Penitentiary.

In a § 2255 proceeding, a petitioner may raise the issue of his mental incompetency at time of trial despite the fact that it may constitute a collateral attack upon the judgment of sentence. Bishop v. United States, 350 U.S. 961, 76 S.Ct. 440, 100 L.Ed. 835 (1956); Gregori v. United States, 243 F.2d 48 (5 Cir. 1957). In such a proceeding, as in other civil cases, the burden of proof is upon the petitioner, Bell v. United States, 265 F.Supp. 311 (N.D.Miss.1966), aff'd 375 F.2d 763 (5 Cir.1967), to establish by a preponderance of the evidence that at the time of his trials in November 1962 and again in May 1963 he was unable to understand the charges against him and to assist his counsel in his own defense. United States v. Harris, 211 F.Supp. 771 (S.D.Fla.1962), aff'd 316 F.2d 229 (5 Cir.1963). According to the Supreme Court, the test must be "whether he [had at time of trial] ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he [had] a rational as well as factual understanding of the proceedings against him." Dusky v. United States, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960). It is not

---

1. *§ 4245. Mental incompetency undisclosed at trial*

   "Whenever the Director of the Bureau of Prisons shall certify that a person convicted of an offense against the United States has been examined by the board of examiners referred to in title 18, United States Code, section 4241, and that there is probable cause to believe that such person was mentally incompetent at the time of his trial, provided the issue of mental competency was not raised and determined before or during said trial, the Attorney General shall transmit the report of the board of examiners and the certificate of the Director of the Bureau of Prisons to the clerk of the district court wherein the conviction was had. Whereupon the court shall hold a hearing to determine the mental competency of the accused in accordance with the provisions of section 4244 above, and with all the powers therein granted. *In such hearing the certificate of the Director of the Bureau of Prisons shall be prima facie evidence of the facts and conclusions certified therein.* If the court shall find that the accused was mentally incompetent at the time of his trial, the court shall vacate the judgment of conviction and grant a new trial."

2. 18 U.S.C. § 4241 provides in relevant part:

   "A board of examiners for each Federal penal and correctional institution shall consist of (1) a medical officer appointed by the warden or superintendent of the institution; (2) a medical officer appointed by the Attorney General; and (3) a competent expert in mental diseases appointed by the Surgeon General of the United States Public Health Service."

enough to show the presence of a mental illness, for that does not equate with incompetency to stand trial, Feguer v. United States, 302 F.2d 214 (8 Cir. 1962), as "one may be suffering from a mental disease which is at the root of anti-social action and simultaneously have a rational and factual understanding of court proceedings and be able to consult with a lawyer on a reasonably rational basis. Lee v. Alabama, 406 F. 2d 466 (5 Cir.1969). Conversely, a positive finding of gross mental disorder which can and does impair a person's judgment and interfere with his rational understanding is the most convincing evidence that, if a condition of that character existed at time of trial, the accused person was without requisite mental competency, and his conviction may not be upheld.

In the instant case, conflicting inferences and conclusions may be drawn from the proof so that our decision is primarily a factual one. On the whole record, we conclude that petitioner has successfully met his burden, i.e., the court is persuaded that more likely than not he was mentally incompetent at the time of his trials, convictions and sentences. It is uncontradicted that within approximately three years after his trials he was found not merely mentally incompetent but grossly psychotic with schizophrenic, paranoid delusions to a degree indicating the condition had existed for a considerable length of time. All psychiatrists and medical experts agree that if that condition had in fact existed at the time of his 1962 and 1963 trials, there would be no question concerning his mental incompetency. Medical science recognizes that "schizophrenic reaction, paranoid type" in its early stages can affect thinking; and that once begun, schizophrenia is very likely to affect the person's thought processes and to revert from time to time in further grossly psychotic "breaks" or episodes.

It is significant to note that from 1966 on petitioner's symptoms were uniformly manifested by grandiose, aggressive, and unrealistic thoughts and expressions and by irrational behavior typical of paranoid psychosis, such as hostility to others and denials of psychosis. Whether petitioner suffered psychic trauma as a result of his being struck on the head by lightning at an early age is speculative, but the description of his conduct by his mother and brother strongly suggest an inception of mental illness even before he was sent to the Texarkana prison in 1959 and after his release therefrom. At that institution, petitioner's psychiatric examination with a conclusion of "no apparent psychosis" must be regarded as superficial because of inaccurate observations that he was without hostility, that no difficulty was expected from him while at the Texarkana institution, that he would make a good inmate and would do his job without much coaxing. In direct opposition to this are substantial factual reports from the Texarkana prison which are copied on the margin and strongly indicate the presence of mental disorder.[3]

3. Admission—Orientation Report dated June 18, 1959:
   "Poor housekeeper. Careless and apparently not concerned about his personal appearance and the condition of his clothes. Attitude toward work, toward institution, and toward cooperation with officers and other inmates seems to be below average. Three other inmates have reported having had minor difficulties with him. He doesn't have any close associates, and I have never observed him engaged in conversation with anyone else. From my observation and personal contacts with him he impresses me as thinking rather highly of himself and his past, and is bitter and resentful as a result of his sentence. General overall institutional adjustment is expected to be not better than fair." Prison office memorandum dated June 5, 1959 (referred to in Exhibit 4):
   " 'At 4:00 P.M. this date, Mr. Hall reported to me that an inmate or inmates had reported to him that inmate Beale 11278, has been acting in a very

The critical question, of course, is whether petitioner had adequate mental competency at the time of trial. Perhaps the best argument that he had such capacity stems from the fact that neither the veteran trial judge, the United States Attorney nor defense counsel thought that a mental examination for petitioner was appropriate under the circumstances. Yet the evidence shows the fact to be that one suffering from a mental disease may appear rational and reasonable to a layman although his judgment is, by reason of such disease, grossly impaired, which interferes with a rational understanding. The record adequately demonstrates that petitioner's behavior prior to and at the time of his trial on the jury-tampering charge was in keeping with symptoms of a serious mental illness. Beginning with his "brazen" request for the jury list from the United States Attorney, his "bizarre" reaction to the accusation that he had tampered with the jury and lack of concern that his attorney was quitting the case, and continuing through his behavior at time of trial, it convincingly appears that petitioner was without adequate understanding of the seriousness of the charge against him, even though he may have had a limited factual understanding with the result that he was unable to intelligently confer with counsel and assist in his defense. In general, petitioner's behavior at time of trial provides a frame of reference for the grandiose, aggressive and unrealistic thinking which the specialists later diagnosed as paranoid psychosis.

As stated by Dr. Moreau, petitioner at time of trial "may have had a superficial and concrete 'understanding' of the nature of the charges against him but this understanding * * * was not the broad reality-oriented type of understanding which [a person] needs in order to assist counsel in his own defense." It was Dr. Guschwan's conclusion that petitioner "could not have rationally comprehended his position", since "all the evidence is consistent with Mr. Beale's having become psychotic before 1962 and his having impaired judgment during his jury tampering trial. There is much less information about the patient in May 1963 but still considerable possibility that his disability continued straight through." It was Dr. Kinzel's view that "the evidence strongly suggests that Mr. Beale was unable to cooperate with counsel and unable to judge the seriousness of the charges against him by virtue of a psychotic mental illness and not simply by virtue of character defect at the times in question." These conclusions rest upon careful analysis of all known facts regarding petitioner's case and commend themselves as superior to contrary views of two other psychiatrists who changed their original opinions of petitioner's mental incompetency at time of his trials largely on the basis of reading lay testimony contained in the various transcripts.

■ Thus the court is led to the conclusion that petitioner lacked mental competency to stand trial on November 26, 1962, by reason of a severe mental disorder and that this condition continued to exist at the time of his second trial on May 13, 1963. Justice requires that the merit of petitioner's motion be recognized and his sentences set aside on account of his mental incompetency then existing.

peculiar manner in his quarters in A&O.' The report stated that Beale appeared to be insane and that the other inmates in their quarters are afraid of him. It also said that Beale is always remarking that he will kill someone." Parole Progress Report dated June 24, 1959 (referred to in Exhibit 4):

" 'While in the admission and orientation unit, it was reported that he was a poor housekeeper, careless and apparently not concerned about his personal appearance. Some of the other inmates have reported minor difficulties with him and have reported him to act "strange". Some of them also reported that they heard him state that he was going to kill someone.' It is noted that during social interview, he expressed considerable hostility, rather generalized, toward the officials who had caused his conviction."